1

2

3

4

5

6                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
7                                        AT SEATTLE

8    KING COUNTY,

9                          Plaintiff,              Case No. C20-0060-RAJ-SKV

10        v.                                       REPORT AND RECOMMENDATION

11   MICHAEL J. ABERNATHY, et al.,

12                          Defendants.

13

14                  I.        INTRODUCTION

15        This matter comes before the Court on Defendants Michael J. Abernathy's, Gina M.

16   Abernathy's, Scott C. Baisch's, Jennifer C. Baisch's, Jody J. Brewster's, Howard M. Crow's,

17   Margaret W. Crow's, Andrzej Milkowski's, Lisa M. Milkowski's, Michael Parrott's, and Diana

18   Parrott's Motion for Partial Summary Judgment, Dkt. 40;[1] Defendant Patricia Harrell's Motion

19   for Partial Summary Judgment, Dkt. 48;[2] and Plaintiff King County's Cross Motion for Partial

20   Summary Judgment, Dkt. 65.  Having thoroughly considered the parties' briefing and the

21   relevant record, the Court finds oral argument unnecessary, and finds that Defendants' Motion,

22

23        _____
               [1] Defendants Beres and Harrell have joined this Motion.  *See* Dkts. 41–42, 44, 46.
               [2] Defendants Abernathy, Baisch, Beres, Brewster, Crow, Milkowski, and Parrott have joined this
          Motion.  *See* Dkts. 51–62, 64, 69.

REPORT AND RECOMMENDATION - 1

1  Dkt. 40, should be GRANTED IN PART and DENIED IN PART; Defendant Harrell's Motion,

2  Dkt. 48, should be GRANTED; and Plaintiff's Motion, Dkt. 65, should be GRANTED IN PART

3  and DENIED IN PART for the reasons explained herein.

## II.    BACKGROUND

5      This dispute concerns a 3.6-mile section of the East Lake Sammamish Trail ("ELST"),

6  located in Government Lot 4 of Section 6, Township 24N, Range 6E ("Lot 4") in Sammamish,

7  Washington.  Dkt. 33 ¶¶ 1, 17.  The Seattle, Lake Shore & Eastern Railway Company

8  ("SLS&E") initially acquired an easement over this portion of the ELST ("Corridor") in the

9  1890s pursuant to the General Railroad Right–of–Way Act of 1875 ("1875 Act"), 43 U.S.C.

10  §§ 934–939.  *Id.* at ¶ 19.  Burlington Northern and Santa Fe Railway Company ("BNSF"),

11  SLS&E's successor in interest to the Corridor, deeded its rights in the Corridor to The Land

12  Conservancy of Seattle and King County ("TLC") in 1997.  *Id.* at ¶ 24.  On September 16, 1998,

13  the Surface Transportation Board ("STB") issued an order "railbanking" the Corridor under the

14  National Trails System Act Amendments of 1983 ("Trails Act"), 16 U.S.C. § 1247 *et seq.*, and

15  authorizing its interim use as a recreational trail.  *Id.*  Two days later, TLC deeded its rights in

16  the Corridor to Plaintiff King County.  *Id.*  Since that time, Plaintiff has constructed an interim

17  public trail along the Corridor and is in the process of constructing a permanent, paved trail.  *Id.*

18  at ¶¶ 15–16.

19      On January 14, 2020, Plaintiff filed this lawsuit against Defendants—who own properties

20  in Lot 4 and have built or maintained docks, boat lifts, decks, fences, and other structures in the

21  Corridor and adjacent shorelands—for quiet title, ejectment, and trespass.  *See* Dkt. 33 ¶¶ 31,

22  33–42.  Plaintiff alleges that it owns the Corridor either as an exclusive railroad easement or in

23  fee simple and contends that Defendants' structures are encroaching on the Corridor and

trespassing on public lands. *Id*. at ¶¶ 31–32. Plaintiff asks the Court to adjudge it the legal owner of the Corridor and to require Defendants to remove the encroaching structures under Chapter 7.28 RCW. *Id*. at 9. Plaintiff also seeks damages from Defendants for restoration and remediation of the Corridor and for back rent and other damages under RCW 4.24.630 ("Waste Statute"). *Id*.

While Defendants acknowledge they or their predecessors in interest constructed the structures at issue, they contend that they own the Corridor in fee simple and that Plaintiff only has easement rights to it. Dkt. 37 at 7–8, 14; Dkt. 22 at 5; Dkt. 24 at 6–7, 13. Because of this, they argue Plaintiff cannot prevent them from using the Corridor, so long as their use does not interfere with Plaintiff's easement. *See, e.g.*, Dkt. 22 at 7. They further contend the Corridor does not include any shorelands adjacent to their properties, meaning Plaintiff has no right to interfere with or prohibit their structures on the lake's shorelands. Dkt. 37 at 11–12; Dkt. 22 at 6; Dkt. 24 at 10. Defendants Abernathy, Baisch, Brewster, Crow, Harrell, Milkowsi, and Parrott assert counterclaims for quiet title, trespass, and waste. Dkt. 37 at 14; Dkt. 24 at 13. Defendants Beres assert a counterclaim for declaratory judgment, asking the Court to declare that Plaintiff has no right to interfere with structures in or uses of the Corridor that do not materially interfere with the Corridor's use as a railroad or trail. Dkt. 22 at 8.

Defendants now move the Court on partial summary judgment for an order finding that Plaintiff's interest in the Corridor is limited to easements under the 1875 Act and Trails Act for railroad and public trail purposes; that the 1875 Act did not permit railroad easements across shorelands; and that the Corridor does not burden the shorelands adjacent to Lot 4. *See* Dkt. 40. By cross motion for partial summary judgment, Plaintiff asks the Court to find that Defendants do not have standing to claim ownership of the Corridor; that the Corridor burdens the

shorelands in question by operation of the 1875 Act and/or Article 17, Section 2 of Washington's Constitution; that Plaintiff has the right to eject Defendants' encroachments in the Corridor; and that Defendants Beres and Parrott are barred by res judicata from asserting their counterclaims and defenses. *See* Dkt. 65. Finally, Defendant Harrell moves the Court on partial summary judgment for an order dismissing, or in the alternative limiting, Plaintiff's Waste Statute claims. *See* Dkt. 48.

The Court briefly summarizes the historical background relevant to the parties' dispute below.

A.     The 1875 Act

In the early 1860s, Congress began granting railroad companies rights of way through, and fee simple title to, public lands in checkerboard blocks. *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 96–97 (2014). In the late 1860s, however, public resentment toward these generous land grants began to grow and, by the 1870s, legislative policy shifted to reserving public lands for settlers. *Id.* at 97. Even so, Congress still wished to encourage railroad construction and passed a number of special acts between 1871 and 1875 granting specific railroads "the right of way" through public lands without any accompanying fee simple land grant. *Id.* at 97–98. In 1875, rather than continuing to enact special legislation for each such right of way, Congress passed the 1875 Act. *Id.* at 98.[3]

The 1875 Act provided that "[t]he right of way through the public lands of the United States is granted to any railroad company" meeting certain requirements "to the extent of one hundred feet on each side of the central line of said road." 43 U.S.C. § 934. In order to obtain a right of way, a railroad could either actually construct its road or, prior to construction, file a

---

[3] The relevant portions of the 1875 Act were repealed by the Federal Land Policy and Management Act, § 706(a), 90 Stat. 2793, in 1976. *Brandt*, 572 U.S. at 98.

proposed map of its rail corridor with the local office of the U.S. Department of the Interior in accordance with Section 4 of the Act. *Brandt*, 572 U.S. at 98. Section 4 required a railroad company to file its map within twelve months of survey or location of its right of way. 43 U.S.C. § 937. It further required a company to complete construction of its right of way within five years of locating it. *Id.* Once approved by the Department of the Interior, the right of way would be noted on the land plats at the local office and, moving forward, any lands over which it passed would be "disposed of subject to the right of way." *Id.* By its terms, the 1875 Act did not apply to "any lands within the limits of any military, park, or Indian reservation, or other lands specially reserved from sale" unless an Act of Congress passed prior to March 3, 1875, provided otherwise. 43 U.S.C. § 938.

It is undisputed that the right of way granted to railroads under the 1875 Act was an easement. *See Brandt*, 572 U.S. at 102–06.

B.    The Railway Right of Way through Lot 4

On July 5, 1887, pursuant to the 1875 Act, the Department of the Interior approved a map submitted by SLS&E for a proposed railway right of way along Lake Sammamish. *See* Dkt. 43-4; Dkt. 66-1. The right of way, or Corridor, crossed Lot 4. Dkt. 43-4; Dkt. 66-1. SLS&E's map showed the centerline of the Corridor over portions of the shorelands adjacent to Lot 4. Dkt. 43-4 at 4; Dkt. 65-1 at 2; Dkt. 66-1.

In March of 1888, SLS&E completed construction of its tracks through Lot 4. Dkt. 66-2. On April 18, 1891, SLS&E filed a second map showing the definite location of its completed tracks. Dkt. 65-1 at 3; Dkt. 66-3. This map indicated that part of the completed tracks had been built over the lake's shorelands. Dkt. 65-1 at 3; Dkt. 66-3.

1      C.      Washington Statehood and Constitution

2      On November 11, 1889, following SLS&E's construction of its rail line through Lot 4,

3  Washington became a state.  *See* Dkt. 43-7.  In its constitution, Washington "assert[ed] its

4  ownership to the beds and shores of all navigable waters in the state . . . up to and including the

5  line of ordinary high water within the banks of all navigable rivers and lakes."  Wash. Cont. art.

6  XVII, § 1.  At the same time, Washington disclaimed "all title in and claim to all tide, swamp

7  and overflowed lands, patented by the United States," provided that "the same is not impeached

8  for fraud."  *Id.* at § 2 ("Article 17, Section 2" or "Section 2").

9      D.      Patenting and Sale of Lot 4 to Cowie

10      Two years later, on January 11, 1892, the United States patented Lot 4 to William H.

11  Cowie.  Dkt. 43-8; Dkt. 67-1.  It is undisputed that Mr. Cowie's patent did not include any of the

12  shorelands adjacent to Lot 4.  Then, in 1934, Mr. Cowie's widow deeded Lot 4 to A.W.

13  Rochford by statutory warranty deed ("1934 Deed").  Dkt. 67-3.  The deed conveyed "all of

14  Government Lot Four (4) . . . EXCEPT railroad right-of-way and except County road."  *Id.* at 2.

15  Subsequently, Mr. Rochford and his wife conveyed Lot 4 to Fritz and Helen Sutter by deed

16  recorded on March 31, 1948.  Dkt. 67 at ¶ 7; Dkt. 67-4.  The deed conveyed Lot 4 "[s]ub to ease

17  of Northern Pacific Railway Company for Railroad purposes and except co rd."  Dkt. 67 at ¶ 7;

18  Dkt. 67-4 at 2.

19      E.      Platting of Lot 4 by Sutter and Subsequent Purchase of Adjacent Shorelands

20      In May 1947, the Sutters divided Lot 4 into the View Point Park plat.  Dkt. 66-11.  The

21  legal description for the View Point Park plat provided that the plat consisted of "[a]ll of

22  Government Lot 4, . . . lying east of the east margin of the right of way of the Northern Pacific

23  Railroad; . . . ."  *Id.* at 2.  The plat map also indicated that the Corridor was 100 feet on either

1    side of the centerline of the right of way through Lot 4 and showed the Corridor extending over

2    the shorelands of Lake Sammamish. *Id.* at 3; Dkt. 65-1 at 8. The plat map misrepresented the

3    location of the lake's shoreline by indicating that unplatted land existed between the western

4    boundary of the Corridor and the shoreline, when, in reality, no such land existed adjacent to

5    Defendants' properties. *Compare* Dkt. 66-11 at 3, *with* Dkt. 66-7 at 2.

6        In October 1948, following the platting of View Point Park, the Sutters entered into a

7    contract with the State of Washington to purchase shorelands adjacent to Lot 4. Dkt. 43-11; Dkt.

8    66-12. Pursuant to the contract, the Sutters were to purchase "[t]he shore lands of the second

9    class, owned by the State of Washington, situate in front of, adjacent to or abutting upon lot 4, . .

10   . with a frontage of 24.70 lineal chains, more or less." Dkt. 43-11 at 2; Dkt. 66-12 at 5. In 1958,

11   after the Sutters paid the contract price in full, the Governor of Washington deeded them the

12   shorelands. Dkt. 43-12; Dkt. 66-13. The deed described the shorelands being conveyed in the

13   same manner as the contract. Dkt. 43-12 at 2; Dkt. 66-13 at 2.

14       F.    Conveyance of the Corridor to Plaintiff

15       In April 1997, BNSF, SLS&E's successor in interest to the Corridor, conveyed its rights

16   in the Corridor to TLC via quit claim deed. Dkt. 66-14. The deed described the conveyance as

17   "[a]ll that portion of said Railway Company's 200.0 foot wide Branch Line right of way, being

18   100.0 feet wide on each side of said Main Track centerline upon, over and across Government

19   Lot 4 . . . ." *Id.* at 11. The deed also provided that the conveyance was subject to "all existing

20   interests, including but not limited to all reservations, rights-of-way and easements of record or

21   otherwise." *Id.* at 3.

22       On September 16, 1998, the STB issued a Notice of Interim Trail Use authorizing the

23   "railbanking" of the Corridor under the Trails Act, thereby allowing its interim use as a

1    recreational trail. *See* Dkt. 43-17. On September 18, 1998, TLC conveyed the Corridor to

2    Plaintiff via quit claim deed. Dkt. 43-18; Dkt. 66-15. The deed described the conveyance in the

3    same manner as the deed from BNSF to TLC. *See* Dkt. 43-18 at 3, 9; Dkt. 66-15 at 3, 9. On

4    August 11, 1998, prior to accepting the quit claim deed from TLC, King County Department of

5    Transportation completed a survey of the deeded area. Dkt. 43-19. The survey showed a 200-

6    foot wide right of way through Lot 4 crossing portions of the lake's shorelands. *Id.* at 10–11.

7        G.    Plaintiff's Project

8        On December 15, 2000, King County Council unanimously adopted a plan for an interim

9    public trail along the railbed of the Corridor. Dkt. 43-20. Plaintiff completed construction of the

10   interim trail in 2006 and is currently in the process of constructing a permanent paved trail

11   through the Corridor. Dkt. 33 ¶¶ 15–16. As contemplated, the permanent trail requires

12   Defendants to remove their structures from the Corridor. *See* Dkt. 65 at 16; Dkt. 68 ¶ 10.

13   Plaintiff has released various iterations of its plans for the permanent trail over the past fifteen

14   years, all of which are public record and show the Corridor as 200 feet wide through Lot 4.

15   Dkts. 71-2–71-4. Plaintiff has also held town halls, organized group and one-on-one meetings

16   with interested parties, and sent out letters and public notices to those impacted by its project.

17   Dkt. 72 ¶ 3. When filing this lawsuit in January 2020, Plaintiff hand delivered a letter to each

18   Defendant instructing them to remove their structures from the Corridor. Dkt. 66-25.[4]

19                III.    DISCUSSION

20       A.    Legal Standard

21       "The court shall grant summary judgment if the movant shows that there is no genuine

22   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

23

---

[4] Plaintiff sent a similar letter to Defendants Crow when adding them to the lawsuit. Dkt. 66 ¶ 26.

R. Civ. P. 56(a).  In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248–49.  Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

       **B.**     <u>The 1875 Act and Rights of Way over Lands under Navigable Waters</u>

       By cross motions for partial summary judgment, Plaintiff and Defendants move the Court for an order determining whether the 1875 Act granted rights of way to railroads that burdened lands under navigable waters.  Plaintiff contends that it did, arguing that because the right of way granted to SLS&E under the 1875 Act extends 100 feet on each side of the centerline, and because the centerline abuts the lake and crosses the shorelands in certain places, the right of way burdens the shorelands.  *See* Dkt. 65 at 21–23.  Defendants argue that under the Equal Footing Doctrine, 1875 Act rights of way cannot burden shorelands because the Act does not contain a clear expression of congressional intent to dispose of lands under navigable waters.  Dkt. 40 at 22–24.

1    The Equal Footing Doctrine provides that the federal government holds land under

2 navigable waters[5] "in trust for future States, to be granted to such States when they enter the

3 Union and assume sovereignty on an 'equal footing' with the established States." *Montana v.*

4 *United States*, 450 U.S. 544, 551 (1981).  When a state enters the Union, title to such land passes

5 to the state and is governed by state law.  *Id.*  "The State's power over the beds of navigable

6 waters remains subject to only one limitation: the paramount power of the United States to

7 ensure that such waters remain free to interstate and foreign commerce."  *Id.*  In other words,

8 Congress can convey land under navigable waters and defeat the title of a new state "in order to

9 perform international obligations, or to effect the improvement of such lands for the promotion

10 and convenience of commerce with foreign nations and among the several states . . . ."  *Shively v.*

11 *Bowlby*, 152 U.S. 1, 48 (1894).

12    That being said, "because control over the property underlying navigable waters is so

13 strongly identified with the sovereign power of government," courts will not hold that the federal

14 government has conveyed such land "except because of 'some international duty or public

15 exigency.'" *Montana*, 450 U.S. at 552 (quoting *United States v. Holt State Bank*, 270 U.S. 49, 55

16 (1926)); *see also Shively*, 152 U.S. at 48.  Given this, a court deciding title to land under

17 navigable waters must "begin with a strong presumption against conveyance by the United

18 States," *Montana*, 450 U.S. at 552, and must not infer conveyance unless (1) the intention was

19 "definitely declared or otherwise made plain," *Holt State Bank*, 270 U.S. at 55, (2) the intention

20 was rendered in "clear and especial words," *Martin v. Waddell's Lessee*, 41 U.S. 367, 411

21 (1842), or (3) "the claim confirmed in terms embraces the land under the waters of the stream."

22 *Packer v. Bird*, 137 U.S. 661, 672 (1891).

23

---

[5] The parties do not dispute that Lake Sammamish is navigable.

1

### 1.   *The Equal Footing Doctrine's Applicability to Easements*

2    As a threshold matter, Plaintiff argues that the Equal Footing Doctrine only applies to fee

3    simple conveyances of lands under navigable waters, so is inapplicable in instances like this one

4    where Congress has granted easement rights to such lands.  Dkt. 65 at 25–27.  Plaintiff points to

5    *United States v. Washington*, 873 F. Supp. 1422, 1444 (W.D. Wash. 1994) (cleaned up), in which

6    this Court noted that "the Supreme Court has applied the Equal Footing Doctrine in one context

7    only, namely when evaluating a claim of right to lands beneath navigable waters based upon an

8    alleged conveyance or retention of fee simple ownership by the United States prior to statehood."

9    Defendants, on the other hand, argue that because easements prevent a state from having the

10    "absolute right to control and dispose of" its lands under navigable waters, the Equal Footing

11    Doctrine applies.  Dkt. 74 at 13.

12    Plaintiff's reliance on *Washington* is misplaced.  *Washington* addressed a tribe's pre-

13    statehood reservation of fishing rights and did not in any way involve a claim of right—in fee

14    simple or otherwise—to lands under navigable waters.  *See Washington*, 873 F. Supp. at 1442–

15    45.  Further, the U.S. and Washington Supreme Courts have indicated that the Equal Footing

16    Doctrine precludes <u>any</u> impairment of a state's title to lands under navigable waters.  *Martin*, 41

17    U.S. at 410 ("For when the revolution took place, the people of each state became themselves

18    sovereign; and in that character hold the absolute right to all their navigable waters, and the soils

19    under them, for their own common use, subject only to the rights since surrendered by the

20    constitution to the general government."); *Shively*, 152 U.S. at 58 (providing that grants of

21    Congress to public lands bordering navigable waters convey "no title or right below high-water

22    mark, and do not impair the title and dominion of the future state . . . ."); *Eisenbach v. Hatfield*, 2

23    Wash. 236, 245, 26 P. 539 (1891) (concluding that "the state has full power" to dispose of the

1   lands under navigable waters "subject to no restrictions," meaning "no individual can have any

2   legal right whatever to claim any easement in" the same). Thus, because the case law does not

3   support Plaintiff's position, the Court finds the Equal Footing Doctrine applies to easements.

4           2.      *The 1875 Act and Congressional Intent to Burden Lands under Navigable*

5                   *Waters*

6           Defendants argue the 1875 Act does not contain the requisite intent to dispose of or

7   encumber future states' title to land under navigable waters because the Act addresses only

8   "'public lands of the United States' and does not mention any land under navigable water, such

9   as shorelands." Dkt. 40 at 23. Similarly, Defendants argue the text of the Act, which only

10  discusses upland features, demonstrates that the Act only applies to uplands. *Id.* Finally,

11  Defendants argue Section 5 of the 1875 Act, which states the Act does not apply to "lands

12  specially reserved from sale," confirms that the Act does not apply to lands under navigable

13  waters because such lands are specially reserved from sale by the federal government. *Id.*

14          Plaintiff argues the "plain language" of the 1875 Act does not exclude lands under

15  navigable waters and Defendants improperly seek to supplement Congress' language. Dkt. 82 at

16  7. Plaintiff likewise contends the 1875 Act's Section 5 exemption does not apply to shorelands

17  because lands under navigable waters are generally reserved from sale, not "specially reserved

18  from sale." *Id.* at 8. Further, Plaintiff argues Congress' intent to permit railroad construction

19  over shorelands via the 1875 Act can be inferred from the "history and context of railroad

20  construction and operations" in the late 19th and early 20th centuries. Dkt. 65 at 23.

21          The Court is persuaded that lands under navigable waters are likely not "lands specially

22  reserved from sale" within the meaning of Section 5, and are instead generally reserved from

23  sale, because specially reserved lands means "the reservation of a specific tract of land within

designated boundaries." *State of North Dakota*, 13 L.D. 454, 454, 1891 WL 757 (1891). Further, the Court notes the practical realities associated with constructing railroads[6] and the fact that the language of the 1875 Act does not explicitly preclude the Act's application to lands under navigable waters. But while these factors weigh in favor of finding that Congress intended the 1875 Act to burden lands under navigable waters, the Court finds them insufficient to overcome the clear Supreme Court precedent holding that general acts of Congress granting rights to the "public lands of the United States" do not apply to lands under navigable waters absent clear congressional intent to the contrary.

In *Mann v. Tacoma Land Co*., 153 U.S. 273, 14 S. Ct. 820, 822 (1894), the Supreme Court affirmed the principle that the term "public lands of the United States" in a general act of Congress does not include lands under navigable waters. In that case, prior to Washington joining the Union and pursuant to a general act of Congress, Mann received approval for a land patent for a tract of land located in Commencement Bay in Tacoma, Washington. *Id.* at 821. The act in question permitted patents to be issued for "unoccupied and unappropriated public lands" of the United States. *Id*. Mann then sought a court order to prohibit Tacoma Land Co. from trespassing on the tract of land, which was comprised of tidelands. *Id.* at 820. In affirming the lower court's dismissal of the case, the Court held the act in question did not authorize the

---

[6] Plaintiff points to language in *United States v. City of Anchorage, State of Alaska*, 437 F.2d 1081, 1084 (9th Cir. 1971), providing that "[a] railhead on the coastline would be useless without wharves, docks and other harbor facilities normally constructed on tide and submerged lands," to support its position that the practical realities of railroad construction necessitate finding that the 1875 Act permitted railroad rights of way across lands under navigable waters. Dkt. 65 at 23. But *City of Anchorage* involved a different statute, which chartered a railroad wholly owned and operated by the federal government and authorized the President to "build or otherwise acquire docks, wharves, terminal facilities, and all structures needed for the equipment and operation of such railroad or railroads . . . ." *City of Anchorage*, 437 F.2d at 1082. The statute likewise authorized the President to "perform any and all acts in addition to those specifically set out in the statutory language which were necessary to accomplish the purposes and declared objects of the Act." *Id*. Given this, the Ninth Circuit concluded the act in question permitted the conveyance of lands under navigable waters. *Id.* at 1084. No such language exists in the 1875 Act.

1   conveyance of tidelands. *Id.* at 822. The Court explained "the term 'public lands' does not

2   include tide lands" and instead is used in legislation to describe lands "subject to sale or other

3   disposal under general laws." *Id*. (quoting *Newhall v. Sanger*, 92 U.S. 761, 763 (1875)).

4   Similarly, the Court confirmed that while Congress has the power to dispose of lands under

5   navigable waters, it has never done so by general laws, and that "the general legislation of

6   congress in respect to public lands does not extend to tide lands." *Id.* Because the act was

7   general in nature and contained no expression of congressional intent to convey land under

8   navigable waters, the Court held Mann did not have title to the tract of land. *Id.*

9        Here, the 1875 Act similarly lacks the requisite congressional intent to overcome the

10  presumption against pre-statehood conveyances of lands under navigable waters. For starters, as

11  a statute that affects the general public, it is a general act of Congress, *Fed. Power Comm'n v.*

12  *Tuscarora Indian Nation*, 362 U.S. 99, 115–16 (1960), that grants railroads meeting certain

13  requirements a right of way through the "public lands of the United States." 43 U.S.C. § 934.

14  As *Mann* makes clear, the general laws of Congress with respect to public lands do not cover

15  lands under navigable waters. Further, the 1875 Act only explicitly grants railroads rights in

16  upland property. *See id.* (providing that railroads have the "right to take, from the public lands

17  adjacent to the line of said road, material, earth, stone, and timber necessary for the construction

18  of said railroad" and enabling railroads to take "ground adjacent to such right of way for station

19  buildings, depots, machine shops, side tracks, turnouts, and water stations . . . ."). It makes no

20  reference to lands under navigable waters or to features associated with water, such as bridges,

21  wharfs, or culverts, from which congressional intent to grant such lands could be inferred. Thus,

22  because the 1875 Act is general in nature and does not demonstrate Congress intended to burden

23

1    lands under navigable waters, the Equal Footing Doctrine precludes finding the Act permitted

2    railroad rights of way across shorelands.

3        Plaintiff argues U.S. Supreme Court case law makes clear that the Equal Footing

4    Doctrine is intended to preclude conveyances of land under navigable waters to private citizens,

5    and not conveyances like those contemplated by the 1875 Act because, unlike the former, the

6    latter promote commerce and are made for the public benefit.  Dkt. 65 at 26–27.  In so arguing,

7    Plaintiff cites to *Shively* and *Prosser v. N. Pac. R. Co.*, 152 U.S. 59 (1894), cases decided the

8    same day.

9        *Shively* involved ownership by private individuals of land under the Columbia River in

10   Astoria, Oregon.  *Shively*, 152 U.S. at 3–6.  In that case, pursuant to an act of Congress, Shively

11   recorded title to the land before 1854 and before Oregon became a state in 1859.  *See id.* at 2.  In

12   1865, following Oregon's admission to the Union, the United States issued Shively a patent for

13   the land.  *Id.* at 3.  In 1876, however, Oregon deeded the same land to Bowlby.  *Id.* at 3–6.  The

14   Court determined that while Congress has the power to convey lands under navigable waters to

15   promote commerce, navigation, and to carry out public purposes, it had not expressed the

16   requisite intent to do so in the act at issue in the case.  *Id.* at 48–51.

17       *Prosser*, on the other hand, involved ownership of land under Commencement Bay by the

18   Northern Pacific Railroad Company.  *See Prosser*, 152 U.S. at 61.  The railroad claimed title to

19   the land pursuant to the 1864 railroad statute that chartered its existence, "An act granting lands

20   to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's sound on

21   the Pacific coast by the northern route" ("1864 Act"), 13 Stat. 365.  *Id.* at 60–61.  In *Prosser*, the

22   Court noted Congress has the power to grant the shorelands "as might be necessary or

23   convenient for the building, maintenance, use, and enjoyment of such structures as might be

required for commerce and transportation . . . ." *Id.* at 64.  Based on this language, Plaintiff

alleges the Court in *Prosser* held the "Equal Footing Doctrine does not apply and the shorelands

were properly conveyed to the railroad under the 1864 Act."  Dkt. 65 at 27.  Per Plaintiff, the

"clear import of these companion cases from the Supreme Court is that railroad grants are not

'general laws to dispose of land' used by speculators like Mr. Shively, but are exactly the type of

action by Congress to promote commerce and transportation where shorelands are important for

this public purpose."[7] *Id.*

 The Court acknowledges a distinction between granting lands under navigable waters to a

railroad company versus an individual speculator; however, contrary to Plaintiff's assertions, the

Supreme Court in *Prosser* did not hold that the Equal Footing Doctrine was inapplicable or that

the lands in question were conveyed to the railroad.  The Court provided that "whether the grant

of congress to the Northern Pacific Railroad Company of the right to construct a railroad to the

waters of Puget sound can be construed as authorizing the corporation to lay out its railroad for

two miles, below high-water mark . . . cannot properly be decided in this suit, and we express no

opinion upon it."  *Prosser*, 152 U.S. at 64.  Further, while the Court agrees *Shively* and *Prosser*

make clear the power of Congress to make pre-statehood conveyances of lands under navigable

waters, that is not the relevant question.  The question is whether Congress' intent to convey

such lands is clearly expressed in a given statute.  Neither *Shively* nor *Prosser* compel the

---

[7] Similarly, Plaintiff contends the cases cited by Defendants "feature courts rejecting the idea that upland owners, 'by virtue of [their] contiguity to the water, [have] certain rights in the shore' of navigable waters."  Dkt. 82 at 9 (quoting *Eisenbach*, 2 Wash. at 246).  Plaintiff argues that, by contrast, "the question here is whether a federally-granted railroad easement can be judicially terminated by the Equal Footing Doctrine when it was constructed over the shorelands."  *Id.* at 9–10.  But *Shively*, for example, involved a claim to land under navigable waters resulting from recorded title to the submerged land and a patent issued by the federal government for the same, not simply from Shively's ownership of land contiguous to the shoreline.  *Shively*, 152 U.S. at 2–3.

conclusion Congress intended in the 1875 Act to grant railroads rights of way over lands under navigable waters.

Citing *Kneeland v. Korter*, 40 Wash. 359, 82 P. 608 (1905), and *Wilson v. Prickett*, 79 Wash. 89, 139 P. 754 (1914), Plaintiff argues the Washington Supreme Court, applying *Prosser*, held the 1864 Act conveyed lands under navigable waters to the railroad.  Dkt. 65 at 22.  While *Kneeland* recognized the power of Congress to grant lands under navigable waters, it did not decide whether such a grant occurred on the facts of the case.  *Kneeland*, 40 Wash. at 364.  *Kneeland* recognized title was conveyed pursuant to Article 17, Section 2 of Washington's Constitution.  *Id*. at 364–65.  Further, *Wilson* dealt with title to land under nonnavigable waters.  *Wilson*, 79 Wash. at 91.  Neither case supports Plaintiff's position.

Even if *Kneeland* and *Wilson* did hold that the 1864 Act granted land under navigable waters to the railroad, the 1864 Act differs from the 1875 Act in important ways.  Specifically, it vested the railroad with "all the powers, privileges, and immunities necessary to carry into effect the purposes of this act," empowered the railroad to construct the railway "by the most eligible railroad route, as shall be determined by said company," and provided that the railway "shall be constructed . . . with all the necessary draws, culverts, bridges, viaducts, crossings . . ." and the like.  13 Stat. 365 at 366, 368.  Such language could be construed as indicating Congress' intent to burden lands under navigable waters with 1864 Act rights of way.  The 1875 Act contains no such language.

Plaintiff argues Congress' intent for 1875 Act rights of way to burden lands under navigable waters can also be inferred from a subsequent railroad act enacted by Congress, "An Act Extending the homestead laws and providing for right of way for railroads in the District of Alaska, and for other purposes" ("1898 Act"), 43 U.S.C. §§ 942-1–942-9.  Dkt. 65 at 27–28.  In

the 1898 Act, Congress specifically provided that rights of way granted pursuant to the Act would not burden land under navigable waters, stating that "nothing . . . shall be construed as impairing in any degree the title of any State that may hereafter be erected . . . to tide lands and beds of any of its navigable waters . . . ." 43 U.S.C. § 942-1.  According to Plaintiff, this supports its position that lands under navigable waters were burdened or conveyed by the 1875 Act because, if the 1875 Act did not implicitly apply to such lands, there would be no need for Congress to expressly exempt them from the 1898 Act.  Dkt. 65 at 28.

Defendants argue the provision in the 1898 Act proves the opposite because, unlike the 1875 Act, the 1898 Act also included language authorizing railroads to connect their railways "'with any navigable stream or tide water'" and  to "'construct and maintain necessary piers and wharves for connection with water transportation.'"  Dkt. 74 at 10–11 (quoting 42 U.S.C. § 942-1).  They contend "Congress felt the need to make clear" it did not intend the 1898 Act to burden lands under navigable waters.  *Id.* at 11.  Defendants' position is correct.  Congress passed the 1898 Act shortly after the U.S. Supreme Court decided *Shively* and *Prosser*.  In *Prosser*, the Court left open the "serious question" of whether the 1864 Act authorized the railroad to construct its railway over lands under navigable waters.  *Prosser*, 152 U.S. at 64.  It follows that Congress' explicit reservation of title to lands under navigable waters in the 1898 Act was intended to address this question and rebut any presumption that title to such lands had been conveyed by the Act as a result of its reference to navigable bodies of water, piers, and wharfs.

Nor is the Court persuaded by Plaintiff's argument that accepting the Equal Footing Doctrine in this case would violate the Contracts Clause of the U.S. Constitution because a land grant is a contract and, pursuant to the 1875 Act, Congress granted SLS&E a 200-foot wide railroad easement through Lot 4 that covered adjacent shorelands.  Dkt. 65 at 29.  The Contracts

Clause restricts states from passing laws that impair contractual obligations.  U.S. Const. art. I, §

10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . .").  The

Equal Footing Doctrine is not a state law, it is a federal legal doctrine, and the Contracts Clause

is irrelevant.

In sum, because the 1875 Act is general in nature, applies to the "public lands of the

United States," and does not explicitly express congressional intent to burden lands under

navigable waters, the Court concludes it did not grant railroad rights of way across shorelands.

Defendants' Motion should be granted.

C.    Article 17, Section 2 of Washington's Constitution and Shorelands Adjacent to

Lot 4

Plaintiff moves the Court for an order finding that, regardless of whether the Equal

Footing Doctrine precludes pre-statehood grants by the federal government of land under

navigable waters, Article 17, Section 2 conveyed the shorelands within the Corridor to SLS&E

upon Washington's adoption of its constitution.

Section 2 provides that Washington "disclaims all title in and claim to all tide, swamp

and overflowed lands, patented by the United States: Provided, the same is not impeached for

fraud."  Wash. Const. art. XVII, § 2.  The Washington Supreme Court has held the intent of this

disclaimer is to "ratify the action of the United States in the issuance of such patents."  *Scurry v.

Jones*, 4 Wash. 468, 470, 30 P. 726 (1892).  In other words, Section 2 is "substantially a grant to

the patentees of the interest of the state in the land so situated."  *Id.* at 469.

The test to determine the applicability of Section 2 "is a simple one."  *Anderson v. Olson*,

77 Wn.2d 240, 243, 461 P.2d 343 (1969).  If a claimant establishes that, prior to statehood, he

"made proof of all facts necessary to cause the patent to issue, Article 17, section 2 operates as a

grant to the claimant of title to the tidelands." *Id.* at 243–44.  This means Section 2 applies "even though the patent was actually issued after statehood, if the right to the patent accrued prior to the adoption of the state constitution." *Mercer Island Beach Club v. Pugh*, 53 Wn.2d 450, 453, 334 P.2d 534 (1959); *see also Narrows Realty Co. v. State*, 52 Wn.2d 843, 847–48, 329 P.2d 836 (1958); *Wilson*, 79 Wash. at 92; *Kneeland*, 40 Wash. at 366.  Washington law applies to determine the rights of pre-statehood patentees under Section 2.  *Anderson*, 77 Wn.2d at 241.  Washington courts have applied Section 2 to lands under navigable waters of lakes.  *See Mercer Island Beach Club*, 53 Wn.2d at 451; *Van Siclen v. Muir*, 46 Wash. 38, 40, 89 P. 188 (1907).

Plaintiff argues the Corridor was patented to SLS&E when the Department of the Interior approved SLS&E's proposed map in 1887, prior to Washington's statehood.  Dkt. 65 at 33.  Per Plaintiff, this resulted in Washington disclaiming all title and claim to the shorelands within the Corridor and affirmatively granting SLS&E fee title to the same.  *Id*.  For this reason, Plaintiff contends that, when Washington deeded the shorelands adjacent to Lot 4 that were "owned by the State of Washington" to the Sutters in 1958, the deed did not convey any portion of the shorelands within the Corridor, as Washington no longer owned them.  Dkt. 82 at 12.

Defendants argue Section 2 is inapplicable to the shorelands at issue because Section 2 only applies to pre-statehood conveyances of fee title and, here, SLS&E received only an easement.  Dkt. 74 at 18.  According to Defendants, Section 2 clearly only pertains to fee title ownership because, by its terms, it disclaims "all title in and claim to" lands under navigable waters.  *Id.* at 19 (citing Black's Law Dictionary (11th ed. 2019) definitions for "title" and "claim").  Defendants also note both *Mercer Island* and *Kneeland*, on which Plaintiff relies, involved the 1864 Act, which not only conveyed fee title to the railroad, but also provided that patents would issue for the conveyances.  *Id.* at 20–21.  Because the 1875 Act did not convey fee

1    title to qualifying railroads and did not explicitly provide that patents would issue to railroads

2    once they satisfied the Act's requirements, Defendants argue Section 2 is inapplicable. *Id.* at 21.

3         Plaintiff's position is correct. "Title" and "claim," as used in Section 2, plainly define the

4    State's disclaimed interest in the relevant lands, not the patentee's claimed interest. Neither

5    word limits the operation of Section 2 to only pre-statehood conveyances of fee title. Further,

6    cases hold that rights of way granted under the 1875 Act are equivalent to "patented" rights. *See*

7    *Great N. Ry. Co. v. Steinke*, 261 U.S. 119, 125 (1923) ("There is no provision in the [1875 Act]

8    for the issue of a patent, but this does not detract from the efficacy of the grant. The approved

9    map is intended to be the equivalent of a patent defining the grant conformably to the intendment

10   of the act . . . ."); *Oregon Trunk Line v. Deschutes R. Co.*, 172 F. 738, 740 (C. C. D. Or. 1909)

11   ("The approval of the [1875 Act] map is therefore the act which vests in the corporation title to a

12   definite right of way over the public lands for a road thereafter to be constructed. Such approval

13   is equivalent to a conveyance or patent from the government for the route delineated on the plat .

14   . . ."). *See also Noble v. Union River Logging R. Co.*, 147 U.S. 165, 174–77 (1893) (analyzing

15   1875 Act right of way grants as land patents); Black's Law Dictionary at 877 (1st Ed. 1891)

16   (defining "patent" as "[a] grant of some privilege, property, or authority, made by the

17   government or sovereign of a country to one or more individuals.").

18        Defendants do not dispute this fact, but argue that "whether SLS&E's railroad map

19   constituted a patent is irrelevant" because the "material issue" is whether SLS&E received fee

20   title to the Corridor's shorelands.[8] Dkt. 74 at 19 n.9. Nothing in the text of Section 2 supports

21

22   _____

     [8] Defendants also note that the Supreme Court in *Brandt* subsequently limited *Steinke*'s holding
     that patents purporting to convey 1875 Act rights of way were "inoperative to pass title" to homesteaders.

23   Dkt. 74 at 19 n.9 (citing *Brandt*, 572 U.S. at 108). But the Court's limitation in *Brandt* did not pertain to
     whether 1875 Act rights of way are considered patented rights. As noted above, land patents were capable
     of conveying any right to or privilege in land, not simply fee title. Thus, *Brandt*'s limitation is inapplicable
     to the arguments here.

this reading.  Further, when Section 2 was being considered, 1875 Act rights of way were considered "neither a mere easement, nor a fee simple absolute, but a limited fee."  *Rio Grande W. Ry. Co. v. Stringham*, 239 U.S. 44, 47 (1915).  This indicates the participants in Washington's Constitutional Convention would have equated 1875 Act rights of way with rights of way granted under other railroad statutes conveying fee title for the purposes of Section 2.  Moreover, Washington adopted Section 2 to "prevent any controversy" over patented lands and to "avoid disturbing rights under such conveyances."  *Kneeland*, 40 Wash. at 364.  Regardless of whether the 1875 Act conveyed an easement, fee title, or limited fee to railroads, a railroad constructing its tracks on lands under navigable waters would undoubtedly lead to controversy over title to those lands and impact the railroad's rights under the 1875 Act—precisely what Section 2 was intended to prevent.

Neither is the fact that the 1875 Act did not actually authorize the patenting of railroad rights of way over lands under navigable waters determinative of whether Section 2 conveyed such patented lands to the railroad.  In *Kneeland*, the Washington Supreme Court confirmed Section 2 was intended not only to convey lands under navigable waters when the United States properly granted them, but when it erroneously assumed to have granted them.  *Kneeland*, 40 Wash. at 364–66.  In that case, the question was whether a patent received by the railroad pursuant to the 1864 Act partially covering tidelands effectively conveyed those lands to the railroad.  *Id.* at 362.  The plaintiff argued even if the United States government had no authority to grant the tidelands, "having assumed to do so," the railroad and its successors in interest owned them by operation of Section 2.  *Id.*  The Court agreed, noting that "[t]he constitutional convention of this state, with a commendable sense of honor, thought it but simple justice to disclaim title to all tide lands patented by the United States, without regard to the technical right

of the general government to convey the same . . . ." *Id.* at 366 (quoting *Cogswell v. Forrest*, 14 Wash. 1, 3, 43 P. 1098 (1896)).  Because it was "admitted that the United States government did issue to the railroad company a patent covering this land," *id.* at 364, the Court held Section 2 disclaimed the state's interest in the tidelands and conveyed the same to the railroad.  *Id.* at 363–66.

The Court in *Kneeland* also distinguished the U.S. Supreme Court's holding in *Mann* that Section 2 could not convey the tidelands at issue, even though Mann had a patent for them, because "there was no right to a patent" under the operative act.  *See Mann*, 14 S. Ct. at 823.  Per the Court, Mann could not rely on Section 2 because he "had no rights whatever to the tide lands he was seeking to file upon with the [act], and there was no legal authority by which he ever could, with said [act], acquire any rights in or to any portion of such lands."  *Kneeland*, 40 Wash. at 367–68.  By contrast, in *Kneeland*, there was "no question as to the railway company's right to a patent to the principal part" of the land in question.  *Id.* at 368.  The issue was simply that the patent covered certain tidelands it arguably should not have.  The same is true here.  While the federal government had no authority to convey the Corridor's shorelands to SLS&E under the 1875 Act, it did have the authority to convey the majority of the Corridor.  Further, the patent obtained by the railroad definitively covered the Corridor's shorelands and the railroad constructed portions of its tracks thereon.  As a result, *Kneeland* makes clear that Section 2 operated here to convey title to the Corridor's shorelands to the railroad.

Defendants argue Section 2 was only intended to convey title to lands between the ordinary highwater mark and the government meander line, if one existed.  Dkt. 74 at 19–20.  According to Defendants, when pre-statehood federal patents to uplands bordering navigable waters passed title to a government meander line located below the ordinary highwater mark, the

1   Equal Footing Doctrine would result in the lands between the ordinary highwater mark and the

2   meander line being nullified and passed back to the state.  *Id.* at 19–20.  Defendants argue

3   Washington adopted Section 2 to prevent this outcome (i.e., to prevent the state from reclaiming

4   title to patented lands located between the ordinary highwater mark and the lower meander line),

5   not to prevent it from reclaiming title to lands located below the ordinary highwater mark if no

6   meander line existed.  *Id*. at 20.  Because Plaintiff offers no evidence SLS&E received a patent to

7   lands located below the ordinary highwater mark, but above the government meander line,

8   Defendants argue its Section 2 argument fails.  *Id.*

9          The Court acknowledges a number of cases applying Section 2 do so in instances where a

10  party claimed rights to land under navigable waters by virtue of a patent granting the party title

11  up to a government meander line located below the ordinary highwater mark.  *See, e.g.*, *Harris v.*

12  *Hylebos Indus., Inc*., 81 Wn.2d 770, 772, 505 P.2d 457 (1973); *Mercer Island Beach Club*, 53

13  Wn.2d at 452–53; *Washington Boom Co. v. Chehalis Boom Co*., 90 Wash. 350, 355–56, 156 P.

14  24 (1916).  But this resulted from the factual circumstances in which such cases have most

15  frequently arisen—i.e., when a patent purported to convey title by referencing a meander line

16  falling below the ordinary highwater mark—not a prerequisite to the invocation of Section 2.

17  Section 2 "prevails when the calls of a patent extend waterward of the line of ordinary high tide."

18  *Smith Tug & Barge Co. v. Columbia-Pac. Towing Corp*., 78 Wn.2d 975, 978, 482 P.2d 769

19  (1971); *see also Hewitt-Lea Lumber Co. v. King Cty*., 113 Wash. 431, 432–33, 194 P. 377 (1920)

20  (distinguishing *Washington Boom Co.*'s holding that because there was no meander line, Section

21  2 did not apply, on the particularity of the facts of that case and recognizing the applicability of

22  Section 2 when there was no meander line covering the portion of the slough at issue); *Wilson*,

23  79 Wash. at 91–92 (recognizing the applicability of Section 2 when the tidelands at issue were

1   not meandered); *Kneeland*, 40 Wash. at 365–67 (recognizing the applicability of Section 2 when

2   the tidelands at issue were not meandered, but were instead surveyed and platted by the federal

3   government).

4          By its terms, SLS&E's patent granted it a right of way 100 feet wide on either side of the

5   track's centerline.  *See* 43 U.S.C. § 943; Dkt. 43-4; Dkt. 65-1 at 2; Dkt. 66-1.  As written, this

6   right of way extended waterward of Lake Sammamish's ordinary highwater mark and

7   encompassed the shorelands at issue here.  Because the calls of SLS&E's patent to the Corridor

8   extended waterward of the ordinary highwater mark, Section 2 operated to "disclaim" the state's

9   interest in the Corridor's shorelands and convey the same to SLS&E when the Department of the

10  Interior approved SLS&E's proposed map in 1887 (or alternatively when SLS&E completed

11  construction of its tracks in 1888).[9]

12

13

14

---

15         [9] Defendants point to a statute adopted shortly after Washington became a state that granted upland

16  property owners the right to purchase lands under navigable waters in front of their upland properties for
    sixty days, so long as any owners of valuable commercial improvements on such lands had the exclusive

17  right to purchase the lands for the same sixty-day period.  Dkt. 40 at 27; *see also id.* (citing RCW 81.36.100,
    also enacted within months of Washington becoming a state, which granted any current or future railroad

18  company the right to construct bridges across navigable waters). According to Defendants, this legislation
    indicates Washington took sole ownership and control of lands under navigable waters upon becoming a

19  state, and "recognized that railroads might need to either buy lands under navigable waters from the State
    or receive the State's permission to cross those submerged lands."  *Id.*  While this legislation may evidence

20  Washington's ownership and control over lands under navigable waters not patented by the federal
    government prior to Washington's statehood, it does not nullify the operation of Section 2 or purport to

21  allow upland owners to purchase lands under navigable waters previously disclaimed and conveyed by the
    state in accordance with that Section.

22         Similarly, Defendants argue a 1917 map submitted by the railroad in accordance with the Valuation
    Act of 1913, 37 Stat. 701, showed an 1875 Act easement located only on Lot 4's uplands and no easement

23  in the adjacent shorelands.  Dkt. 40 at 24–25.  According to Defendants, this map demonstrates SLS&E
    only claimed rights to the uplands.  *Id.* at 25.  But the map does show the centerline of the railway tracks
    over the shorelands adjacent to Lot 4.  Dkt. 43-10 at 2–3; Dkt. 66-5 at 2.  Further, as Defendants
    acknowledge, the "property interests that the railroad company believed it obtained and held is not
    dispositive" of the property interests it actually obtained.  Dkt. 40 at 24.

1    As a result, in 1958, when the Sutters purchased the shorelands adjacent to Lot 4 that

2    were "owned by the State of Washington,"[10] they did not take title to the shorelands located

3    within the Corridor, as the state no longer owned those shorelands.  *See Jones v. Callvert*, 32

4    Wash. 610, 613, 73 P. 701 (1903) ("Under this [Section 2] disclaimer it would seem that no

5    argument is necessary to justify the conclusion that the lands applied for here, which had been

6    patented by the United States, and where there is no charge of fraud involved, cannot now be

7    sold by the state authorities, and that the state authorities have no jurisdiction whatever over

8    them so far as their title is concerned.").  Plaintiff's Motion should be granted.

9    D.    Defendants' Standing to Quiet Title in the Corridor

10    By counterclaim, Defendants seek to quiet title in the Corridor under Washington's quiet

11    title statute, Chapter 7.28 RCW.  *See* Dkt. 24 at 13; Dkt. 37 at 14.  Plaintiff contends Defendants

12    lack any property interest in the Corridor and therefore lack standing.  Dkt. 65 at 17–21.

13    "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of

14    Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To satisfy Article III's

15    standing requirements, Defendants must show they have suffered, among other things, an "injury

16    in fact."  *Maya v. Centex Corp*., 658 F.3d 1060, 1067 (9th Cir. 2011).  To suffer an "injury in

17    fact," Defendants must have a property interest in the Corridor.  *Sammamish Homeowners v. Cty.*

18    *of King*, No. C15-284-MJP, 2015 WL 3561533, at *2 (W.D. Wash. June 5, 2015).

19

20

---

21    [10] Defendants point to a 1948 report from Washington's Office of Commissioner of Public Lands stating the shorelands to be purchased by the Sutters had "never been affected by any transaction and are open," Dkt. 43-14 at 2, as evidence the railroad had no property interest in the shorelands at the time the

22    Sutters purchased them.  *See* Dkt. 40 at 11; Dkt. 74 at 17–18.  But the report describes the desired shorelands in the same manner as the deed that ultimately conveyed them—"[t]he shore lands of the second class,

23    owned by the State of Washington . . . ." Dkt. 43-14 at 2.  It cannot be read to refer to the shorelands within the Corridor, which Washington did not own.

Similarly, Washington's quiet title statute "requires that a person seeking to quiet title establish a valid subsisting interest in property and a right to possession thereof." *Washington Sec. & Inv. Corp. v. Horse Heaven Heights, Inc*., 132 Wn. App. 188, 195, 130 P.3d 880 (2006); *see also* RCW 7.28.010.  A "valid subsisting interest" in property means "legal title to the real estate." *Kaseburg v. Port of Seattle*, No. C14-0784-JCC, 2016 WL 4440959, at *5 n.4 (W.D. Wash. Aug. 23, 2016), *aff'd sub nom. Kaseburg v. Port of Seattle*, 744 Fed. Appx. 356 (9th Cir. 2018).  If a party cannot show legal title to the property, the party lacks standing as a real party in interest.  *Horse Heaven Heights*, 132 Wn. App. at 195; *see also Kaseburg*, 2016 WL 4440959, at *5; *Sammamish Homeowners*, 2015 WL 3561533, at *4.  Defendants bear the burden to prove they own the Corridor and have standing as real parties in interest.  *Horse Heaven Heights*, 132 Wn. App. at 195; *Magart v. Fierce*, 35 Wn. App. 264, 266, 666 P.2d 386 (1983); *Kaseburg*, 2016 WL 4440959, at *5.

Plaintiff argues Defendants' chains of title evidence their lack of property interest in the Corridor because the 1934 Deed conveying Lot 4 from Ms. Cowie to Mr. Rochford explicitly excepted out the Corridor from the property description.  Dkt. 65 at 18–19.  Plaintiff further argues this exception was memorialized by the Sutters, who excepted the Corridor from all subsequent conveyances of Lot 4 by excluding it from the View Point Park plat.  *Id.* at 19.  Finally, Plaintiff contends all of Defendants' current deeds exclude the Corridor, either by specifically excepting it from the property description or by removing it through metes and bounds descriptions that use the Corridor as a boundary line.  Dkt. 82 at 3.[11]

---

[11] Plaintiff also argues a state court judgment against Defendants Beres and Defendants Parrotts' predecessor in interest precludes their quiet title counterclaims on res judicata and collateral estoppel grounds.  *See* Dkt. 82 at 3, 5–6.  The Court addresses this argument in Section III.H, *infra*.

1    Defendants argue their deeds "expressly grant" them title to the property within the

2    Corridor by conveying title to adjoining second class shorelands and describing upland areas

3    within the boundaries of the Corridor.  Dkt. 74 at 27.  Beyond this, Defendants argue any deed

4    language excepting out the Corridor from prior conveyances of their properties was not intended

5    to reserve title to the Corridor in the grantor.  *Id.* at 16–17.  Instead, it was intended to indicate

6    the property was being transferred "subject to" the railroad's easement.  *Id.* at 17.  Finally,

7    Defendants argue Plaintiff's taxation of their properties as waterfront properties demonstrates

8    that their title extends into the Corridor and does not end at the Corridor's eastern boundary.  *Id.*

9    at 27–28.

10          1.    *Legal Framework*

11    Determining whether the 1934 Deed or Defendants' deeds conveyed title to the Corridor

12    requires the Court to interpret the meaning of the deeds' language.  The interpretation of a deed

13    is a mixed question of law and fact.  *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban*

14    *Lines Ass'n*, 156 Wn.2d 253, 271, 126 P.3d 16 (2006).  "[W]hen construing a deed, the intent of

15    the parties is of paramount importance and the court's duty to ascertain and enforce."  *Brown v.*

16    *State*, 130 Wn.2d 430, 437, 924 P.2d 908 (1996).  The intent of the parties is derived from the

17    entire deed, and courts consistently examine the circumstances surrounding the transfer and the

18    subsequent conduct of the parties if helpful in ascertaining intent.  *Kershaw*, 156 Wn.2d at 272

19    n.15; *Harris v. Ski Park Farms, Inc*., 120 Wn.2d 727, 739, 844 P.2d 1006 (1993).  Ambiguity in

20    a deed is resolved against the grantor.  *Kershaw*, 156 Wn.2d at 272; *Harris*, 120 Wn.2d at 745.

21          2.    *The 1934 Deed*

22    Because Defendants' deeds could not have conveyed them title to the Corridor if the

23    Corridor was excluded by the 1934 Deed, the Court first examines this conveyance.  The 1934

REPORT AND RECOMMENDATION - 28

1    Deed conveyed "all of Government Lot Four (4) . . . EXCEPT railroad right-of-way and except

2    County road" from the Cowies to Mr. Rochford.  *See* Dkt. 67-3.  "The term 'except' is generally

3    meant to exclude the described property."  *Ray v. King Cty*., 120 Wn. App. 564, 588, 86 P.3d

4    183 (2004); *see also Duus v. Town of Ephrata*, 14 Wn.2d 426, 430, 128 P.2d 510 (1942).  On

5    this ground, Plaintiff argues that by excepting out the Corridor from the transaction, the 1934

6    Deed retained any rights in the Corridor for the Cowies and their heirs.  Dkt. 65 at 19.  Citing

7    *Kershaw*, Defendants argue the deed language purporting to except the Corridor "operated only

8    to exclude an easement, rather than exclude the land burdened by the easement."  Dkt. 74 at 17.

9            In *Kershaw*, a cable company installed a fiber optic cable within a railway easement.

10    *Kershaw*, 156 Wn.2d at 256.  The company received permission from the easement holder to do

11    so, but did not receive permission from the owner of the property over which the easement

12    passed.  *Id.*  The landowner brought suit against the cable company seeking (among other things)

13    to quiet title to the easement area.  *Id.*  The cable company argued the landowner did not have

14    standing to do so because the deed conveying the property to the landowner excepted out the

15    "right-of-way of the Northern Pacific Railway."  *Id.* at 271.

16            The Washington Supreme Court determined the deed's exception was ambiguous; "in

17    addition to operating to reserve an interest in the grantor, it 'logically could have been an

18    expression of the parties' understanding that [the grantee's] fee interest was subject to the

19    railroad's easement.'"  *Kershaw*, 156 Wn.2d at 272 (quoting *Kershaw Sunnyside Ranches, Inc. v.*

20    *Yakima Interurban Lines Ass'n*, 121 Wn. App. 714, 728, 91 P.3d 104 (2004), *aff'd in part, rev'd*

21    *in part*, 156 Wn.2d 253).  In holding the deed did not intend to exclude the railroad easement

22    from the conveyance, the Court relied on the fact that the deed also "excepted" out a road and

23    state highway (both easements burdening the property), that the conveyance was between a

mother and son (suggesting intent to transfer the entire property), and the absence of evidence

that the mother later attempted to convey the property to anyone else. *Id.* at 272–73.

The 1934 Deed mirrors the deed at issue in *Kershaw* in a number of ways. While it did

not convey property between family members, it did except out a county road, like the deed in

*Kershaw*. As in *Kershaw*, the Cowies never asserted any interest in the Corridor following the

conveyance. When Mr. Rochford subsequently conveyed Lot 4 to the Sutters by deed recorded

in 1948, the deed described the property conveyed as "[s]ub to ease of Northern Pacific Railway

Company for Railroad purposes and except co rd." Dkt. 67-4 at 2. This all indicates the

"exception" language in the 1934 Deed was intended to signify the conveyance was "subject to"

an easement in the Corridor, not to reserve title to the Corridor from the transfer.

Plaintiff argues the "exception of the Corridor" from the conveyance was verified by the

Sutters' submission of a certified title report to the state in 1947 that also "excepted" the Corridor

from the property description. Dkt. 82 at 3. But like the 1934 Deed, the title report also

"excepted" the county road from the property description. *See* Dkt. 84-1. Because the 1934

Deed excepted out both the Corridor and a county road from the conveyance, and because the

subsequent conduct of the parties indicates they intended the Deed to convey fee title to the

Corridor, the Court finds the 1934 Deed did not exclude the Corridor from its conveyance, and

Plaintiff's Motion as to Defendants' standing should be denied on this ground.

### 3.    *Defendants' Deeds*

The parties dispute whether Defendants' deeds convey any property interest in the

Corridor to Defendants. While the 1934 Deed conveyed title to the Corridor to Defendants'

predecessor in interest, the Court finds all of Defendants' deeds, except Defendant Harrell's

2013 deed,[12] express an intent to exclude the Corridor from their conveyances.  The relevant

language from Defendants' deeds reads as follows:

Defendants Michael and Gina Abernathy

Parcel A: The most southerly 60.50 feet of Tract 14 in View Point Park, . . . .

Parcel B: That portion of Government Lot 4, . . . lying westerly of the westerly line of the southerly 60.50 feet of Tract 14, in View Point Park, . . . lying south of the north line of the westerly extension of the southerly 60.50 feet of said Tract 14 and lying north of the westerly extension of the south line of Tract 14; Except any portion thereof lying within the Northern Pacific Railroad right-of-way; Together with second class tide lands, as conveyed by the State of Washington, . . . situate in front of, adjacent to, or abutting thereon; . . . .

Dkt. 67-9 at 5 (all caps removed).

The deed also provided that it was "subject to" certain covenants, easements, rights,

agreements, etc., as set forth therein.  *Id*. at 3.

Defendants Scott and Jennifer Baisch

Parcel A: The South 90 feet of Lot 15 in View Point Park, . . . EXCEPT the Southernmost 20 feet thereof; And except any portion thereof lying within the Northern Pacific Railroad Right-of-Way; TOGETHER WITH that portion of Government Lot 4 . . . lying between the Northerly and Southerly lines of the above described main tract extended Westerly, Except said railroad right-of-way; AND TOGETHER WITH 2nd Class Shorelands as conveyed by the State of Washington situate in front of, adjacent to or abutting thereon; . . . .

Dkt. 67-16 at 3.

The deed also provided that it was "subject to" certain "conditions, covenants, easements,

reservations and restrictions appearing of public record and running with the land."  *Id.* at 2.

Defendants Warren and Vicki Beres

The North 40 feet of Lot 16 and the South 30 feet of Lot 17 in View Point Park Addition . . . ; TOGETHER WITH that portion of Government Lot 4 . . . lying between the Northerly and Southerly lines of the above-described main tract, extended Westerly; EXCEPT the Northern Pacific Railroad right of way; TOGETHER WITH 2nd Class Shorelands adjoining. . . . EXCEPT all oil, gases,

---

[12] Defendant Harrell's property was conveyed by two separate deeds, the first recorded in 2011 and the second recorded in 2013.  *See* Dkt. 49-1; Dkt. 67-34.

coal, ores, minerals, fossils, etc., . . . : SUBJECT TO: As delineated in "Exhibit A" of recorded real estate contract between the parties above indicated . . . .

Dkt. 67-20 at 2.

<u>Defendant Jody Brewster</u>

The southerly 20 feet of Tract 15 and the northerly 40.49 feet of Tract 14, View Point Park, . . . . Together with that portion of Government Lot 4, . . . lying southerly of the westerly production of north line of the south 20 feet of Tract 15, View Point Park Addition, and northerly of the westerly production of the south line of the northerly 40.49 feet of Tract 14, View Point Park; Together with second class shore lands adjoining; Except any portion thereof lying within the right of way of Northern Pacific Railroad (Burlington Northern Railroad) . . . .

Dkt. 67-27 at 4 (all caps removed).

The deed also provided that it was "subject to" rights, reservations, covenants, restrictions, agreements, easements, and the like. *Id.* at 2.

<u>Howard and Margaret Crow</u>

That portion of Tract B in View Point Park Addition, . . . lying southerly of a line described as follows: . . . Thence North 88°15'21'' west 66 feet, more or less, to the easterly margin of Burlington Northern (formerly Northern Pacific) Railway right-of-way and the terminus of said line; . . . Together with that portion of Government Lot 4 . . . and of shorelands adjacent, lying westerly of the westerly margin of the Burlington Northern (formerly Northern Pacific) Railway right-of-way, . . . .

Dkt. 67-29 at 4. (all caps removed).

<u>Defendant Patricia Harrell</u>

*2011 Conveyance*:

Lot 18 of View Point Park . . . ; Together with that portion of Government Lot 4, . . . lying westerly of the westerly line of Lot 18 of said plat of View Point Park, lying north of the south line of said Lot 18, extended westerly to Lake Sammamish, and lying south of the north line of said Lot 18, extended westerly to Lake Sammamish; Except the Burlington Northern Railroad Right-of-Way; Except that portion of said Lot 18 as follows; . . . Together with second class shorelands adjoining . . . .

Dkt. 67-34 at 3 (all caps removed).

REPORT AND RECOMMENDATION - 32

1

The deed also provided that it was "subject to" a number of restrictions, covenants,

2

easements, and the like that were listed in an attached exhibit. *Id.* at 2. A provision in the

3

attached exhibit states, "[r]ailroad right-of-way and possible reversionary rights of present or

4

previous owners and/or rights of adjoining property owners, depending upon the intent and/or

5

purpose of the instrument under which title was conveyed to the railroad." *Id.* at 5 (all caps

6

removed).

7

*2013 Conveyance*:

8

That portion of Tract B, View Point Park, . . . described as follows: Begining (sic)

9

at the southeast corner of said Tract B; Thence northerly along the westerly margin
of Issaquah-Redmond Road a distance of 111.39 feet; Thence south 85°46'50''

10

west to the easterly margin of said railrod (sic) right-of-way[;] Thence northerly
along said easterly margin to the westerly prolongation of south line of Lot 7 of
said plat of View Point Park; Thence westerly along said westerly prolongation to

11

the center line of said railroad right of way; Thence southerly along said center line
to the westerly prolongation the south line of said Tract B; Thence easterly along

12

said south line and its westerly prolongation to the point of beginning; Except that
portion of the Northern Pacific Railway now Burlington Northern right-of-way; . .

13

. .

14

Dkt. 49-1 at 2–3 (all caps removed).

15

The deed also provided that "[t]his conveyance is subject to covenants, conditions,

16

restrictions and easements, if any, affecting title . . . ." *Id.* at 3.

17

Defendants Andrzey and Lisa Milkowski

18

The north 70 feet of Lot 17 of View Point Park, . . . Together with that portion of
Government Lot 4, . . . Lying westerly of the westerly line of Lot 17 of said plat of

19

View Point Park, lying north of the south line of said north 70 feet of Lot 17,
extended westerly to Lake Sammamish and lying south of the north line of said Lot

20

17, extended westerly to Lake Sammamish; Except the Burlington Northern
Railroad right-of-way; . . . . Also except the following described area: . . . ; Together

21

with second class shorelands adjoining; . . . .

22

Dkt. 67-35 at 4 (all caps removed).

23

Defendants Michael and Diane Parrott

The North 10 feet of Lot 15 and the South 60 feet of Lot 16, View Point Park, . . . ; Together with that portion of Government Lot 4 . . . lying between the Northerly and Southerly lines ob (sic) the above described main Tract, extended Westerly; Except the North Pacific Railroad right of way; Together with second class shorelands adjoining; Also together with an easement for ingress, egress and utilities . . . ; Except any portion lying within the main Tract; . . . .

Dkt. 67-39 at 2.

The Court concludes Defendants' deeds can be grouped into five categories: (1) those that "except" the Corridor and another Lot 4 area from the legal description (Defendants Milkowski and Parrott); (2) those that "except" the Corridor from the legal description and also provide that the conveyance is "subject to" certain conditions, restrictions, easements, etc. (Defendants Abernathy and Brewster); (3) those that "except" the Corridor and another Lot 4 area or property right from the legal description, and also provide that the conveyance is "subject to" certain conditions, restrictions, easements, etc. (Defendants Baisch, Beres, and Harrell's 2011 deed); (4) those that describe the property in metes and bounds and exclude the Corridor using its easterly and westerly margins as property boundaries (Defendants Crow); and (5) those that describe the property in metes and bounds and use the center line of the Corridor as a boundary for the property (Defendant Harrell's 2013 deed).

All but the fifth category compel the conclusion that Defendants do not have a property interest in the Corridor, and therefore lack standing to assert their counterclaims for quiet title.

  a.  Category 4

The deed falling within category 4—the Crow deed—does not purport to convey any interest in the Corridor whatsoever. It uses the easterly and westerly margins of the Corridor as boundaries for the conveyance of both the upland and shoreland portions of the property. Because the Crow deed carves out the Corridor from the conveyance altogether, Plaintiff's

1  Motion as to the Crow Defendants' standing should be granted and their counterclaim for quiet

2  title should be dismissed.

3                   b.        <u>Categories 1 through 3</u>

4        Plaintiff's Motion as to standing should also be granted for Defendants with deeds in

5  categories 1 through 3 because those deeds either "except" out additional property from their

6  legal descriptions in a way that indicates the property was intended to be excluded; provide that

7  the conveyances are "subject to" certain restrictions, including easements, while "excepting" out

8  the Corridor; or do both.

9        As with the 1934 Deed, Defendants argue the language "excepting" out the Corridor from

10  their deeds is intended to exclude just an easement and not the underlying fee.  Dkt. 74 at 17;

11  Dkt. 85 at 7.  In other words, by "excepting" out the Corridor, the parties to the deeds intended to

12  indicate the property was "subject to" an easement in the Corridor.  But this argument fails to

13  account for the fact that (1) the Milkowski, Parrott, Baisch, Beres, and 2011 Harrell deeds also

14  all "except" additional Lot 4 property or property rights from their transfers in an exclusionary

15  way, and (2) the Abernathy, Brewster, Baisch, Beres,[13] and 2011 and 2013[14] Harrel deeds also

16  all provide that the conveyances are "subject to" a number of restrictions, including easements.

17        Unlike the deed at issue in *Kershaw*, the additional property or property rights excepted

18  from Defendants' deeds are not recognized easements that also burden their properties, like a

19  county road or state highway.  Instead, they are property or property rights—adjacent Lot 4

20

21       [13] Defendants Beres have not asserted a counterclaim for quiet title under Washington's quiet title
statute and the parties do not address their standing to bring a claim for declaratory judgment under 28

22  U.S.C. § 2201.  *See* Dkt. 22 at 7–8.  Even so, the Court addresses their standing to quiet title under the
standard briefed by the parties.

23       [14] While Defendant Harrell's 2013 deed also falls within this category, summary judgment as to
Defendant Harrell's standing to quiet title to her 2013 property should be denied for the reasons stated in
Section III.D.3.c, *infra*.

1    areas, oil, gas, coal, etc.—Defendants otherwise would have assumed were conveyed to them

2    absent an "exception" in their deeds.  Defendants argue these additional "exceptions" are

3    consistent with the exception of the Corridor because they all describe things the grantor did not

4    own, so "naturally excepted" from the "more general grant."  Dkt. 85 at 9.  This argument fails to

5    account for the manner in which Defendants' deeds otherwise acknowledge the existence of

6    easements on their properties—by providing that the conveyance is "subject to" an easement, not

7    by "excepting" the easements from the transfer altogether.  As the Court noted in *Kershaw*, the

8    deed purporting to except the right of way and the road/state highway "could just as reasonably

9    be interpreted to reference them because of the significant nature of the easements present."

10   *Kershaw*, 156 Wn.2d at 272.  But in *Kershaw*, only the right of way and road/state highway were

11   referenced and they were both "excepted"—no other easements were acknowledged in the deed.

12   The same reasoning cannot apply here, where the deeds that reference other easements do not

13   except those easements; they provide that the conveyances are "subject to" them.

14           Moreover, Defendants' position that by excepting out the Corridor, the grantors of

15   Defendants' deeds intended to signify they did not own the easement, as opposed to the

16   underlying fee, is contradicted by *Ray*, 120 Wn. App. 564.  In *Ray*, landowners, as successors in

17   interest to grantors who deeded a property interest to the railroad in 1887, brought an action to

18   quiet title against King County (the railroad's successor in interest), to determine whether the

19   deed conveyed the railroad fee title or an easement.  *Id*. at 568–69.  After analyzing the language

20   of the deeds in the parties' chains of title, the court of appeals held the deed conveyed fee title to

21   the railroad.  *See id*. at 571–90.  In doing so, the court found language in the appellant's current

22   deed nearly identical to that at issue here—"EXCEPT the Northern Pacific Railway Company's

23   right of way"—indicated a successor in interest to the original property owner "believed that the

1  right of way previously conveyed to the Railway was not part of the fee conveyed to the Rays."

2  *Id*. at 587–88.  In other words, the court determined the use of "except" in relation to the right of

3  way supported finding the grantor thought fee title to the right of way was excluded from the

4  transfer, not that easement rights were excluded.

5       Defendants further argue that "EXCEPT railroad right-of-way" means "except the

6  railroad easement" because, under *Brandt*, the rights conveyed to the railroad by virtue of the

7  1875 Act were easement rights.  Dkt. 85 at 7.  As Defendants acknowledge, however, "'right of

8  way' is ambiguous," Dkt. 74 at 16, and can mean either fee title or an easement.  *Brown*, 130

9  Wn.2d at 436–38.  There is nothing in the record indicating any party to any deed in Defendants'

10  chains of title understood how the railroad acquired its rights in the Corridor, and Defendants do

11  not dispute that the railroad acquired its rights along the ELST in a myriad of ways (including by

12  fee acquisition).  Thus, the Supreme Court's determination of the rights granted to the railroad by

13  the 1875 Act does not establish the meaning attributed to "right of way" by the parties to

14  Defendants' deeds, nor does it indicate whether they intended to exclude an easement in, or fee

15  title to, the Corridor.  Further, no Defendant has put forth evidence of their intent at the time their

16  properties were conveyed to them.[15]

17       Citing *Kershaw*, Defendants argue the lack of evidence any grantor "ever intended to

18  retain, or believed they had retained, an interest servient to the Railroad Easement" is fatal to

19  Plaintiff's argument that the Corridor was excepted from Defendants' deeds.  Dkt. 85 at 10.  The

20  Court agrees evidence of such intent does not exist, and it is true the lack of such evidence was

21  relevant to the Court's determination in *Kershaw*.  *See Kershaw*, 156 Wn.2d at 272–73.  But this

22

23      [15] By declaration, Defendant Vicki Beres indicates she and her husband "understood" they were "buying the shorelands and the land burdened by the railroad easement" when they bought their property, Dkt. 79 ¶ 7.  However, their understanding is not necessarily indicative of their intent or the intent of the grantors of their property.

was just one of the factors considered by the Court in *Kershaw* and cannot be dispositive here. The "language of the deed under scrutiny is of primary importance in determining the intent of the parties," *Ray*, 120 Wn. App. at 588, and the language of Defendants' deeds indicates the parties intended to except fee title to the Corridor from the conveyances.

Plaintiff argues Defendants do not have standing because the plat underlying their properties excludes the Corridor though "a metes and bounds description that uses the Corridor as a boundary," so owners adjacent to the Corridor cannot claim ownership of it.  Dkt. 82 at 4 (citing *Hornish v. King Cty.*, 899 F.3d 680, 697 (9th Cir. 2018); *Sammamish Homeowners*, 2015 WL 3561533, at *2–3).  Defendants argue their deeds reference the plat to describe and convey both platted and unplatted land, and that Plaintiff is wrong they "cannot own more than what was granted in the plat that created their properties."  Dkt. 85 at 8.  The Court agrees with Defendants that an owner who excludes a rail corridor from a plat is not somehow prohibited from affirmatively conveying unplatted land along with platted, and the cases cited by Plaintiff do not support such a finding.  Even so, the conveyance of unplatted land to Defendants cannot overcome the exception of the Corridor from Defendants' deeds.

Defendants argue Plaintiff offers "no alternative purpose" for the conveyance of the unplatted land containing the Corridor "except to convey the servient estate."  Dkt. 85 at 9.  But this ignores the evidence provided by Plaintiff demonstrating the original View Point Park plat map misrepresented the location of the lake's shoreline by depicting unplatted land between the western boundary of the Corridor and the shoreline, when no such land existed.  *Compare* Dkt. 66-11 at 3, *with* Dkt. 66-7 at 2.  Plaintiff argues this likely accounts for subsequent deed descriptions that purported to add unplatted land in Lot 4 located between the Corridor and the

1  lake to Defendants' chains of title. Dkt. 82 at 4–5 n.1. The Court agrees and Defendants offer

2  nothing to refute this evidence.

3      Defendants also argue they have standing because all of their deeds convey shorelands

4  that Plaintiff contends fall within the Corridor. Dkt. 74 at 27. As discussed in Section III.C,

5  *supra*, however, the Corridor's shorelands were disclaimed by the state and conveyed to SLS&E

6  by operation of Article 17, Section 2, prior to the state's conveyance of any shorelands adjacent

7  to Lot 4 to the Sutters. This means the state could not have conveyed those shorelands to the

8  Sutters, nor could the grantors of Defendants' deeds to Defendants. Any shorelands owned by

9  Defendants that fall outside the Corridor do not give them standing to quiet title in the Corridor.

10      The remainder of Defendants' arguments do not warrant much discussion. Defendants

11  argue the Court should disregard the Declaration of Desirae Schilling, Dkt. 73, as improper

12  expert testimony on the legal interpretation of a deed. *See* Dkt. 85 at 9–10. The Court agrees

13  and has not considered or relied on the Declaration herein. Defendants argue the Court should

14  "spend little time" analyzing whether they have standing because the issue could be easily solved

15  by Defendants filing a quiet title action and demonstrating they have used the Corridor as their

16  own. Dkt. 74 at 17. The Court expresses no opinion as to whether Defendants could

17  successfully quiet title in the Corridor on that ground and cannot base its ruling on the

18  hypothetical occurrence of a future act. Finally, Defendants argue Plaintiff's taxation of their

19  properties as waterfront properties belies its assertion that Defendants do not own the Corridor.

20  *Id.* at 27–28. But Plaintiff was not a party to Defendants' deeds. Thus, the history of its taxation

21  of Defendants' properties is not indicative of the deed parties' intent with regards to the

22  conveyances of those properties, and is irrelevant. *See Kershaw*, 156 Wn.2d at 272 (the intent of

23

1    the parties to a deed is discerned from the language of the deed itself, the circumstances

2    surrounding the transfer, and the subsequent conduct of the parties to the transaction).

3        While ambiguity in a deed is resolved against the grantor, the intent of the parties is of

4    paramount importance. *Harris*, 120 Wn.2d at 745. The Court here finds the deeds in categories

5    1 through 3 indicate the parties to those deeds intended to exclude the Corridor from the

6    conveyances.[16] As such, Plaintiff's Motion as to Defendants Abernathy, Baisch, Brewster,

7    Milkowski, and Parrott should be granted and their quiet title counterclaims should be dismissed

8    for lack of standing. Defendant Harrell's counterclaim to quiet title to her 2011 property should

9    likewise be dismissed.

10                    c.    Category 5

11        The deed falling within category 5—the 2013 Harrell deed—differs from the deeds in

12    categories 1 through 3 in that, while it conveys land outside of the View Point Park plat, it uses

13    the centerline of the Corridor as the western boundary of that conveyance. *See* Dkt. 49-1 at 2–

14    3.[17] This is meaningful because, while the deeds in categories 1 through 3 also convey land

15    outside of the plat, they use the lake as the western boundary of the conveyance. As a result,

16    they purport to convey land to the west of the Corridor's western boundary, whereas, by its

17    explicit terms, the 2013 Harrell deed only conveys land outside of the plat that falls within the

18    Corridor. While the deed also "excepts" the Corridor from the conveyance, describing property

19    outside of the plat would serve no purpose if the exception were to exclude fee title to the

20    property underlying the Corridor. *See* Dkt. 48 at 12. Plaintiff's Motion as to Defendant

21

22        [16] The Court notes the question before it is not who owns the Corridor, but whether Defendants do.
Defendants must win on the strength of their own title and not because ownership of the Corridor's uplands
23    is otherwise unclear. *Harper v. Holston*, 119 Wash. 436, 442, 205 P. 1062 (1922).

        [17] The 2013 Harrell deed also differs from the rest in that it does not convey any interest in
shorelands. *Id.*

1    Harrell's standing to quiet title in the property conveyed by her 2013 deed should therefore be

2    denied.[18]

3    　　　　E.　　Plaintiff's Property Rights in the Corridor

4    　　　　Defendants move the Court for an order finding Plaintiff's property rights in the Corridor

5    limited to easement rights under the 1875 Act and the Trails Act.  According to Defendants,

6    because Plaintiff's predecessors in interest only had easement rights in the Corridor, the

7    quitclaim deed conveying the Corridor to Plaintiff (which Defendants allege is the only source of

8    Plaintiff's rights) could only convey easement rights.  Dkt. 40 at 16–17.  Plaintiff argues that

9    because it "has a deed" that describes a 200-foot railroad Corridor and "Defendants lack

10   standing, title to the 200 foot Corridor must be quieted" in it.  Dkt. 82 at 13; *see also* Dkt. 33 ¶¶

11   34–36.

12   　　　　In *Brandt*, the U.S. Supreme Court held that the "1875 Act 'clearly grants only an

13   easement, and not a fee.'"  *Brandt*, 572 U.S. at 103 (quoting *Great N. R. Co. v. United States*,

14   315 U.S. 262, 271 (1942)).  Further, the Trails Act, which preserves "established railroad rights-

15   of-way for future reactivation of rail service" and permits those rights of way to be used as

16   interim recreational trails, 16 U.S.C. § 1247(d), creates a second easement for trail purposes that

17   is "coextensive" with the railroad right of way it supplements.  *Kaseburg v. Port of Seattle*, C14-

18

19   　　　　[18] One of Plaintiff's general arguments bears addressing here.  Plaintiff argues that "[e]ven if
20   Defendants had a reversionary interest in the Corridor, they still would lack standing because such an
     interest is not a possessory interest under RCW 7.28.010."  Dkt. 65 at 20.  While it may be true that a
     reversionary interest is not possessory for the purposes of Washington's quiet title statute, the Court in
21   *Brandt* determined that the holder of a servient estate subject to an 1875 Act easement maintains a
     possessory interest in the estate.  *Brandt*, 572 U.S. at 105 n.4; *see also Horse Heaven Heights*, 132 Wn.
22   App. at 194 (noting the "general rule is that a right-of-way for a railroad is classified as a limited fee with
     a right of reverter if received from Congress before 1871, but is classified as an exclusive use easement if
     the right-of-way is received after 1871," meaning owners of servient estates burdened by rights of way
23   granted after 1871 have a possessory interest in the right of way).  Because Defendant Harrell has a
     possessory, and not reversionary, interest in the portion of the Corridor granted by her 2013 deed, Plaintiff's
     argument lacks merit.

1   0784-JCC, 2015 WL 6449305, at *7 (W.D. Wash. Oct. 23, 2015); *Hornish v. King Cty.*, 182 F.

2   Supp. 3d 1124, 1130–31 (W.D. Wash. 2016), *aff'd*, 899 F.3d 680 (9th Cir. 2018).

3       Plaintiff does not dispute (1) *Brandt*'s holding or its applicability to the rights obtained by

4   SLS&E, and subsequently TLC, under the 1875 Act; (2) that the Trails Act simply created a

5   second easement in the Corridor, and that neither TLC nor any of its predecessors in interest

6   obtained fee title to the upland portions of the Corridor by other means; or (3) that TLC only

7   conveyed "all of its right, title and interest, if any" in the Corridor to Plaintiff.  Plaintiff simply

8   contends that because it has a deed and Defendants lack standing, it somehow owns the entire

9   Corridor in fee.  It does not.  The deed from TLC to Plaintiff could only and did only convey the

10  rights TLC had in the upland portions of the Corridor—easement rights under the 1875 Act and

11  the Trails Act.  The Court therefore finds Plaintiff's interest in the upland portions of the

12  Corridor limited to easement rights under the 1875 Act and the Trails Act.  Defendants' Motion

13  should be granted.

14      With regards to the shoreland portions of the Corridor, however, Defendants' Motion

15  should be denied.  Article 17, Section 2 of the Washington Constitution operated to convey fee

16  title to the Corridor's shorelands to SLS&E when Washington became a state.  *See* Section III.C,

17  *supra.*  As a result, Plaintiff obtained fee title to the shorelands at issue when TLC, SLS&E's

18  successor in interest, deeded all of its rights in the Corridor to Plaintiff, meaning Plaintiff owns

19  the Corridor's shorelands in fee and has all of the rights associated with such ownership.

20      F.    Plaintiff's Right to Eject Defendants' Encroachments from the Corridor and

21  Recover Damages

22      Plaintiff asserts its entitlement to exclusive use and possession of the Corridor as

23  successor in interest to the railroad and as trail sponsor under the Trails Act.  Dkt. 65 at 34–35.

1    Plaintiff moves the Court for an order finding this permits it to "protect its property rights against

2    trespassers" and eject Defendants' encroachments from the Corridor. *Id.* at 34 (citing RCW

3    7.28.120).

4         Defendants argue Plaintiff's easement in the Corridor is not exclusive and does not give

5    Plaintiff the right to prohibit Defendants' "uses of the land that are not prohibited by the

6    servitude and that do not interfere unreasonably with the uses authorized by the easement[.]"

7    Dkt. 74 at 23 (quoting 3rd Restatement of Property § 4.9 cmt. c (2000)). Defendants further

8    contend Plaintiff presents no evidence of their interference with the easement in the Corridor and

9    that removing their improvements exceeds the scope of Plaintiff's easement rights. *Id.* at 29.

10        RCW 7.28.010, which governs actions in ejectment and to quiet title, specifically confers

11   the right of ejectment on persons who have a "valid subsisting interest in real property, and a

12   right to the possession thereof" by providing that such persons "may recover" the property at

13   issue from others in possession of it. *See also Bruhn v. Pasco Land Co.*, 67 Wash. 490, 493–94,

14   121 P. 981 (1912). This right extends to ejecting unlawful encroaching structures from the

15   property. *See Garcia v. Henley*, 190 Wn.2d 539, 540, 415 P.3d 241 (2018). A prevailing

16   plaintiff can also recover damages for the defendant's wrongful possession of the property

17   beginning six years prior to the commencement of the ejectment action. RCW 7.28.150. In

18   order to prevail in an ejectment action, a plaintiff must establish his own interest in the property

19   at issue and cannot recover based on weaknesses in the defendant's title. *Harper*, 119 Wash. at

20   442. Washington courts permit parties claiming easement rights to utilize RCW 7.28.010's

21   provisions. *See Cole v. Laverty*, 112 Wn. App. 180, 183–84, 49 P.3d 924 (2002).

22        Defendants argue RCW 7.28.010 "merely addresses the requirements of pleadings by

23   plaintiffs and defendants in quiet title actions" and does not articulate the standard that would

apply to permit Plaintiff to eject Defendants' encroachments.  Dkt. 74 at 29.  But the statute itself

articulates the standard—Plaintiff need only demonstrate it has a "valid subsisting interest" in the

Corridor and "a right to the possession thereof."  *See, e.g.*, *Green v. City of Tacoma*, 51 F. 622,

623 (C.C.D. Wash. 1892) ("The laws of this state give to an owner of real property who is

entitled to the immediate possession thereof a right of action against any person who, being in

possession, holds the same against the owner's will, or who claims the title to, or an interest in,

said property adversely to such owner. And in such action every question affecting the title and

right of possession may be determined, and the owner may recover possession of the property,

and damages.").  Defendants do not dispute that Plaintiff satisfies this standard; they simply

argue that they do too.  Thus, whether Plaintiff is entitled to eject Defendants' encroachments

from the Corridor depends on whether its rights entitle it to exclude Defendants.

> 1.    *Plaintiff's Right to Eject Defendants from the Corridor's Shorelands*

The Court finds Article 17, Section 2 of Washington's Constitution conveyed fee title to

the Corridor's shorelands to SLS&E, thereby precluding the state from subsequently conveying

the same shorelands to the Sutters.  *See* Section III.C, *supra*.  It follows, then, that the quitclaim

deed from TLC (SLS&E's successor in interest) to Plaintiff conveying "[a]ll that portion of said

Railway Company's 200.0 foot wide Branch Line right of way" in Lot 4, Dkt. 66-14 at 11—

which undisputedly included the Corridor's shorelands—deeded Plaintiff fee title to the

shorelands.  It likewise follows that the Sutters, in conveying the shorelands adjacent to Lot 4 to

Defendants' predecessors in interest, could not convey the shorelands within the Corridor

because they did not own them.  Because Plaintiff owns the Corridor's shorelands in fee and

Defendants have no interest in them, Plaintiff can eject Defendants' encroachments therefrom.

2.      *Plaintiff's Right to Eject Defendants from the Corridor's Uplands*

The Court also finds Plaintiff has the right to eject Defendants' encroachments from the upland portions of the Corridor.  It is well established that a railroad easement grants the easement holder "exclusive control of all the land within the lines of its roadway."  *Grand Trunk R. Co. v. Richardson*, 91 U.S. 454, 468 (1875).  Defendants argue 1875 Act easements are different because, in *Brandt*, the Supreme Court ruled that, unlike earlier railroad right of way statutes, the 1875 Act granted "simple" easements.  *See* Dkt. 74 at 22–23.  Because the Court in *Brandt* relied on common law principles to define 1875 Act easements, Defendants argue common law should inform whether 1875 Act easements are exclusive.  *Id.* at 23.  According to Defendants, the holder of fee title to the land burdened by a common law easement retains "the right to make all uses of the land that do not unreasonably interfere with exercise of the rights granted" by the easement.  *Id.* (quoting 3rd Restatement of Property § 1.2 cmt. d (2000)).  And because Defendants allege they hold fee title to the Corridor, they assert entitlement to make all uses of the Corridor not prohibited by, and not unreasonably interfering with, Plaintiff's easement.  *Id.*

The Court concludes no genuine issue of material fact supports finding any Defendant, save Defendant Harrell relative to her 2013 property, owns the upland portions of the Corridor in fee.  But because Plaintiff must win on the strength of its own title and not on the weaknesses of Defendants', *see Harper*, 119 Wash. at 442, this is not determinative of whether Plaintiff has the right to eject Defendants' encroachments from the upland portions of the Corridor.  Instead, Plaintiff must demonstrate its own property interest in the Corridor gives it that right.

In *Brandt*, the Supreme Court held that railroads obtained a "mere easement" under the 1875 Act and that the land underlying the easement otherwise remained the property of the

owner of the servient estate.  *See Brandt*, 572 U.S. at 102–06.  The Court applied traditional

common law principles to find that, when the beneficiary of an 1875 Act easement ceases to use

it for its intended purpose, the easement disappears and the owner of the servient estate (i.e., the

federal government or its grantee) resumes full and unencumbered interest in the land.  *Id.* at

104–06.  But contrary to Defendants' assertions, this does not resolve whether an 1875 Act

easement is exclusive, nor does it mean such easements have no attributes greater than those of a

common law easement.

Courts have consistently recognized the uniqueness of railroad rights of way.  As noted in

an early U.S. Supreme Court case (when discussing a right of way under an 1866 land grant),

"[a] railroad right of way is a very substantial thing.  It is more than a mere right of passage.  It is

more than an easement."  *W. Union Tel. Co. v. Pennsylvania R. Co.*, 195 U.S. 540, 570 (1904).

Instead, it is an "interest in the land, special and exclusive in its nature."  *Id.*  In distinguishing a

railroad right of way from a common law easement—which was considered a nonpossessory and

incorporeal interest in property—the Court referred to *Territory of New Mexico v. U.S. Tr. Co of*

*New York*, 172 U.S. 171, 183 (1898), which provided that if a railroad right of way was an

easement, it was "one having the attributes of the fee, perpetuity and exclusive use and

possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property."

State courts have ruled similarly.  In *Morsbach v. Thurston Cty.*, 152 Wash. 562, 568–69,

278 P. 686 (1929), the Washington Supreme Court provided that ". . . the right of way purchased

or condemned by a railroad company is more than a mere easement.  It has been designated as a

qualified or determinable fee, although it is not very important what it is called.  It is taken for a

specific purpose, to be held so long as devoted to that purpose.  A railroad right of way is a very

substantial thing.  It is more than a mere right of passage. It is more than an easement."  *Accord*

1    *Hanson Indus., Inc. v. Cty. of Spokane*, 114 Wn. App. 523, 528, 58 P.3d 910 (2002) (stating

2    same).  In *Smith v. Hall*, 103 Iowa 95, 72 N.W. 427, 428 (1897), the Iowa Supreme Court noted

3    a railroad easement is "not that spoken of in the old law books, but is peculiar to the use of a

4    railroad, which is usually a permanent improvement, a perpetual highway of travel and

5    commerce . . . ."  Thus, whether called an easement or not, a railroad right of way is "much

6    different from a medieval right of way that authorized merely taking horses or wagons across a

7    field" owned by someone else.  *Home on the Range v. AT&T Corp.*, 386 F. Supp. 2d 999, 1014

8    (S.D. Ind. 2005); *see also Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1134 (9th Cir. 2018)

9    ("It is beyond dispute that a railroad right of way confers more than a right to simply run trains

10   over the land.").

11       This makes sense.  A railroad needs more than a "mere right of passage" over the land to

12   operate.  Even so, the case law is clear that the scope and extent of a railroad's right of way is

13   limited by the railroad's needs in constructing, running, and maintaining the railroad itself.  *See*

14   *Kansas City S. Ry. Co. v. Arkansas Louisiana Gas Co.*, 476 F.2d 829, 835 (10th Cir. 1973)

15   (noting a railroad "cannot deprive the owner of the servient estate . . . from making use of the

16   land in strata below the surface and below substrata which are used or needed by the railroad

17   company, and which in nowise . . . interferes with the construction, maintenance and operation of

18   the railroad."); *Home on the Range*, 386 F. Supp. 2d at 1024 (holding that a railroad company

19   could not install fiber optic cable within the scope of in its easement because doing so did not

20   "derive from or further a railroad purpose . . . ."); *Barahona*, 881 F.3d at 1131 (recognizing that

21   1875 Act railroad rights of way must be used for railroad purposes); *Veach v. Culp*, 92 Wn.2d

22   570, 575, 599 P.2d 526 (1979) (providing that while "it is true that in most instances the very

23   nature of a railroad will require it to enjoy a substantial right regardless of the nature of its title,"

1    courts must "look to the actual use being made of this easement in light of the rule that the

2    servient owner retains the use of an easement so long as that use does not materially interfere

3    with the use by the holder of the easement.").[19]

4         Drawing on this proposition, Defendants argue Plaintiff should not be permitted to eject

5    their encroachments because it does not need to in order to maintain its right of way.  Dkt. 74 at

6    29–30.  They cite to *L.K.L. Assocs., Inc. v. Union Pac. R.R. Co.*, No. 2:15-CV-00347-BSJ, 2018

7    WL 2433563, at *7 (D. Utah May 29, 2018), which provided that owners of land burdened by an

8    1875 Act right of way can "occupy and utilize . . . property encumbered by the right of way

9    insofar as it does not interfere with [the railroad's] election, now or in the future, to use and

10   possess for a railroad purpose."  But the court also noted the 1875 Act provided the railroad with

11   a "non-possessory easement" that allowed for "exclusive use and possession insofar as [the

12   railroad] elect[ed] to use the land subject to its easement for a railroad purpose."  *Id.* at *11.[20]

13

14   ───────────────

       [19] Defendants argue *Veach* demonstrates Washington's policy favoring "flexibility and mutual
15   accommodation" between railroads and owners of land burdened by railroad easements. Dkt. 74 at 24.  But
     notably, in *Veach*, the railroad operated regularly only on weekends during the summer, had no paid
16   employees and only one locomotive, made no freight deliveries, and had very limited equipment.  *Veach*,
     92 Wn.2d at 575.  Given this, the Washington Supreme Court held: "As holders of the subservient estate,
17   the plaintiffs are entitled to use the right-of-way in such a manner as does not materially interfere with the
     railroad's use thereof."  *Id.*  Thus, the Court based its ruling largely on the fact that the railroad was not
     using the right of way for railroad purposes the majority of the time.

18       [20] Defendants also cite to *Jie Ao & Xin Zhouf Petition for Declaratory Ord.*, No. FD 35539, 2012
     WL 2047726 (June 4, 2012), for the proposition that even the STB—the federal agency charged with
19   regulating railroads—has held that railroad rights of way are not exclusive. Dkt. 74 at 23.  In that case, the
     STB noted a "property interest permitting access to portions of a railroad ROW, unless exclusive, does not
20   typically unreasonably interfere with the present or future use of the property for activities that are part of
     railroad transportation . . . ." *Jie Ao*, 2012 WL 2047726, at *3.  But in that case, the property owner brought
21   two claims: one for adverse possession of a portion of the railroad's right of way stemming from the location
     of a retaining wall, garage, and driveway therein, and one for a prescriptive access easement.  While the
22   STB determined prescriptive easements "do not affect the rail network in the same way as carving out
     property that is part of a railroad, and . . . may still allow the railroad to access the property," it likewise
23   concluded the owner's adverse possession claim would improperly "permit landowners to carve off strips
     of railroad ROW all over the country for non-rail use." *Id.* at *7.  Defendants encroachments similarly seek
     to carve off property that is part of the railroad and are analogous to the adverse possession claim at issue
     in *Jie Ao*, not the prescriptive easement claim.

1   Because the railroad's right of way was "a function of limited purpose and use," and because the

2   railroad had not indicated it wanted to use the right of way "for a railroad purpose," the court

3   found the question of ejectment "premature." *Id.* The Trails Act was not at issue in the case.

4       By contrast, here, Plaintiff indicates it wants to use the Corridor "for a railroad

5   purpose"—it wants to preserve the right of way for future reactivation as a railway under the

6   Trails Act, entitling it to exclusive use and possession. *See Kaseburg*, 2015 WL 6449305, at *5;

7   *Illig v. United States*, 58 Fed. Cl. 619, 631 (2003) ("We therefore conclude that the Trails Act

8   imposed a new easement across plaintiffs' properties which retained essentially the same

9   characteristics as the original easement, both in its location and exclusivity."). Moreover,

10  contrary to Defendants' assertions, Dkt. 74 at 30, Plaintiff submits evidence indicating the entire

11  width of the Corridor is necessary to accomplish this purpose. *See* Dkt. 68 ¶¶ 8–13. Defendants

12  offer nothing to refute this evidence. As a result, the Court finds Plaintiff entitled to exclusive

13  use and possession of the entire Corridor to accomplish its railroad purpose. Plaintiff can eject

14  Defendants' encroachments from the Corridor, and Plaintiff's Motion should be granted.

15              *3.    Plaintiff's Right to Damages*

16      Plaintiff asks the Court to find it has a right to damages for Defendants' continued

17  trespass in the Corridor. Dkt. 65 at 35–36. Defendants argue Plaintiff is not entitled to collect

18  damages in conjunction with its ejectment action because it cites no evidence in support of its

19  entitlement to damages and fails to state the elements it must satisfy to obtain them. Dkt. 74 at

20  30–31. RCW 7.28.150, which provides that a "plaintiff shall only be entitled to recover damages

21  for withholding the property for the term of six years next preceding the commencement of the

22  action," specifically contemplates that a successful plaintiff in an ejectment action can maintain

23  an action for damages. *See also Green*, 51 F. at 623. Plaintiff "only seeks confirmation of its

1    right to recover damages at this time," Dkt. 65 at 36, and the Court finds RCW 7.28.150

2    implicitly gives Plaintiff that right.  That being said, the Court makes no finding with regard to

3    the proper measurement of such damages or Defendants' ability to offset them.

4         G.    Plaintiff's Waste Claims

5         Plaintiff brings waste claims against Defendants under Washington's Waste Statute,

6    alleging Defendants "should be required to pay current and back rent for all unauthorized uses of

7    the Corridor in Lot 4 and all other damages, costs (including investigative costs) and attorneys'

8    fees . . . ." Dkt. 33 at 9.

9         Washington's Waste Statute provides, in relevant part, that "[e]very person who goes

10   onto the land of another . . . or wrongfully causes waste or injury to the land, or wrongfully

11   injures personal property or improvements to real estate on the land, is liable to the injured party

12   for treble the amount of damages caused by the . . . waste, or injury." RCW 4.24.630(1).  For

13   purposes of the statute, "a person acts 'wrongfully' if the person intentionally and unreasonably

14   commits the act or acts while knowing, or having reason to know, that he or she lacks

15   authorization to so act." *Id.*  Damages recoverable under the Waste Statute include "damages for

16   the market value of the property removed or injured, and for injury to the land, including the

17   costs of restoration." *Id.*  Further, a person who commits waste "is liable for reimbursing the

18   injured party for the party's reasonable costs, including but not limited to investigative costs and

19   reasonable attorneys' fees and other litigation-related costs." *Id.*

20        Defendant Harrell, joined by all other Defendants, moves the Court for an order

21   dismissing Plaintiff's waste claims, alleging Defendants cannot be liable under the Waste Statute

22   because their actions were not wrongful and did not occur on the land of another.  *See* Dkt. 48 at

23   18–22.  Alternatively, Defendant Harrell argues the Court should limit Defendants' liability

1    under the Waste Statute as a matter of law because (1) much of Plaintiff's allegations pertain to

2    actions taken by others for which Defendants are not liable; (2) Plaintiff cannot show

3    compensable injury; (3) the Waste Statute's three-year statute of limitations cuts off liability; and

4    (4) Plaintiff can only recover fees and costs it can attribute to Defendants' conduct after

5    Plaintiff's waste claims are limited.  *Id.* at 23.

6            The Court, while finding all but Defendant Harrell's activities on her 2013 property

7    occurred on the land of another, also finds Defendants' actions were not wrongful.  As indicated,

8    in order to be liable for waste, a party must act wrongfully by "intentionally and unreasonably"

9    committing acts "while knowing, or having reason to know, that he or she lacks authorization to

10   so act."  RCW 4.24.630(1).  Plaintiff argues Defendants "knew or had reason to know that they

11   could not interfere with the Corridor," Dkt. 70 at 16, and lacked authorization to maintain their

12   encroachments therein, because (1) Defendants' deeds excepted the Corridor; (2) the recorded

13   Lot 4 plat map excepted the Corridor; (3) many Defendants applied for "special use permits"

14   from Plaintiff for their encroachments, demonstrating they knew they needed Plaintiff's

15   authorization before acting in the Corridor; and (4) Plaintiff's communications, including letters

16   it sent to Defendants in January 2020 when filing this lawsuit, put Defendants "on notice" their

17   use of the Corridor required Plaintiff's authorization.  *Id.* at 16–17.  Thus, according to Plaintiff,

18   Defendants acted wrongfully within the meaning of the statute.

19           While certain of this evidence indicates Defendants knew or should have known they

20   needed Plaintiff's authorization to act in the Corridor, it does not indicate Defendants knew or

21   should have known their conduct in the Corridor was not authorized.  It is undisputed that

22   Defendants encroachments in the Corridor were tolerated—indeed, even authorized—by Plaintiff

23

and its predecessors in interest for numerous years.  The special use permits to which Plaintiff

refers only reinforce this point.  *See* Dkt. 66-18.

Plaintiff broadly asserts that its communications with Defendants put them on notice that

their encroachments in the Corridor lacked authorization.  Dkt. 70 at 17.  But the

communications offered show Plaintiff consistently refused to tell Defendants whether or not it

planned on allowing their encroachments to remain, not that their encroachments were no longer

authorized.  *See* Dkt. 71-5; Dkt. 72 ¶¶ 4–5, 8; Dkt. 72-1–72-2.

The same applies to Plaintiff's construction plans.  Plaintiff alleges its plans "informed

Defendants that activity within the corridor encroached on the County's easement and that

Defendants would need to remove interfering encroachments."  Dkt. 70 at 17.  The plans in

question—which Plaintiff acknowledges were subject to a complex and lengthy development

process, Dkt. 72-1 at 3—do not definitively indicate the permanent removal of Defendants'

encroachments.  *See* Dkt. 71-2–71-4.  But even if they did, this simply indicates Defendants'

encroachments would cease being authorized once Plaintiff's construction began—not that they

were unauthorized immediately upon release of the plans.  Plaintiff produces no evidence

whatsoever indicating Defendants' encroachments were an issue for Plaintiff prior to January

2020, when it sent letters demanding their removal.  *See* Dkt. 66-25.

Plaintiff argues that "from at least January 2020, Defendants had actual knowledge that

their docks were maintained within the County's Corridor and that they had no authorization to

maintain them."  Dkt. 70 at 20.  This is insufficient to establish Defendants' liability under the

Waste Statute.  The Waste Statute requires a party to act intentionally *and unreasonably* while

knowing they lack authorization to act.  A party who, in good faith, disputes the scope and extent

of their rights in real property does not act unreasonably.  *See Colwell v. Etzell*, 119 Wn. App.

432, 442–43, 81 P.3d 895 (2003); *see also Bund v. Safeguard Properties LLC*, No. C16-920-MJP, 2018 WL 4008039, at *5 (W.D. Wash. Aug. 20, 2018) ("[A] party acting on a good faith belief that their conduct is within the law cannot know[ ], or hav[e] reason to know, that he or she lacks authorization to so act.").

Finally, Plaintiff argues Defendants knew or had reason to know their encroachments in the Corridor were not authorized because Plaintiff previously sued certain Defendants over different encroachments, and a court ruled Plaintiff owns the Corridor and that Defendants have "no right to use or occupy the railroad right of way without permission from King County . . . ." Dkt. 70 at 20 (quoting Dkt. 66-22 ¶ 10).  This simply indicates, however, that Defendants knew or had reason to know the encroachments at issue in that lawsuit were not authorized—not that their current encroachments, many of which were in place at the time of that lawsuit, were not authorized.

In sum, Plaintiff fails to demonstrate Defendants acted wrongfully within the meaning of the Waste Statute.  Defendant Harrell's Motion should be granted and Plaintiff's waste claims should be dismissed.

H.   Applicability of Res Judicata and Collateral Estoppel to Defendants Beres' and Parrotts' Counterclaims and Defenses

Plaintiff moves the Court for an order finding Defendants Beres' and Parrotts' counterclaims and defenses barred by res judicata and collateral estoppel.  According to Plaintiff, King County Superior Court previously decided on summary judgment ("State Court Proceeding") that Defendants Beres and Parrott have no right to use or occupy the Corridor without Plaintiff's permission because Plaintiff "holds an easement entitling it to exclusive use

1    and occupancy of the railroad right of way," meaning Defendants cannot now challenge

2    Plaintiff's rights in the Corridor. *See* Dkt. 65 at 36 (quoting 66-22 ¶ 11).[21]

3          Under res judicata, "a final judgment on the merits of an action precludes the parties or

4    their privies from relitigating issues that were or could have been raised in that action." *Allen v.*

5    *McCurry*, 449 U.S. 90, 94 (1980).  Under collateral estoppel, "once a court has decided an issue

6    of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a

7    suit on a different cause of action involving a party to the first case." *Id.*  Federal courts

8    generally accord preclusive effect to issues decided by state courts. *Id.* at 95.  Indeed, "though

9    the federal courts may look to the common law or to the policies supporting res judicata and

10   collateral estoppel in assessing the preclusive effect of decisions of other federal courts,

11   Congress has specifically required all federal courts to give preclusive effect to state–court

12   judgments whenever the courts of the State from which the judgments emerged would do so . . .

13   ." *Id.* at 96 (citing 28 U.S.C. § 1738).  Accordingly, the Court applies Washington law to

14   determine whether the judgment from the State Court Proceeding bars Defendants Beres' and

15   Parrotts' counterclaims and defenses in this proceeding on res judicata and collateral estoppel

16   grounds. *Holcombe v. Hosmer*, 477 F.3d 1094, 1097 (9th Cir. 2007).

17         Under Washington law, res judicata "prohibits the relitigation of claims and issues that

18   were litigated, or could have been litigated, in a prior action." *Pederson v. Potter*, 103 Wn. App.

19   62, 67, 11 P.3d 833 (2000) (citing *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d

20   898 (1995)).  Specifically, res judicata bars a subsequent action where the prior judgment is a

21   final judgment on the merits, and the prior and subsequent actions have identity between (1)

22

23

---

[21] The Washington Court of Appeals affirmed this decision. *See King Cty. v. Beres*, No. 51116–5–I, 2003 WL 21907632, at *1 (Wash. Ct. App. Aug. 11, 2003).

1    persons and parties, (2) causes of action, (3) subject matter, and (4) quality of persons for or

2    against whom the claim is made.  *Id.*

3         Collateral estoppel "prevents a party from relitigating issues that have been raised and

4    litigated by the party in a prior proceeding." *Clark v. Baines*, 150 Wn.2d 905, 912–13, 84 P.3d

5    245 (2004).  Application of collateral estoppel requires proof of the following:

6              (1) the issue in the prior and current action is identical, (2) the prior
               action ended in a final judgment on the merits, (3) the party against
7              whom collateral estoppel is asserted was a party or in privity with a
               party to the prior action, and (4) the application of collateral estoppel
8              would not work an injustice.

9    *Afoa v. Port of Seattle*, 191 Wn.2d 110, 131, 421 P.3d 903 (2018) (citing *Christensen v. Grant*

10   *Cty. Hosp. Dist. No. 1*, 152 Wn.2d 299, 326, 96 P.3d 957 (2004)).  All four elements must be

11   satisfied for collateral estoppel to apply.  *Clark*, 150 Wn.2d at 913.

12        Plaintiff and Defendants Beres and Parrott were all parties, or in privity with parties, to

13   the State Court Proceeding.[22]  In that Proceeding, as here, Plaintiff sought to quiet title in the

14   Corridor.  *See* Dkt. 75-3 at 16–17; Dkt. 33 ¶¶ 33–36.  The State Court Proceeding concluded

15   with an order on summary judgment, finding that (among other things) (1) SLS&E "perfected

16   title to a 200' wide right-of-way along East Lake Sammamish" via the 1875 Act; (2) pursuant to

17   the 1875 Act, the right of way boundary extends "100' on either side of the as-built railroad

18   centerline"; (3) "King County is successor in interest to SLS&E's title to the railroad right of

19   way"; (4) Defendants Beres and Parrott "have no right to use or occupy the railroad right of way

20   without permission from King County"; (5) as "successor to the SLS&E, King County holds an

21   easement entitling it to exclusive use and occupancy of the railroad right of way"; and (6) "[t]itle

22

23        _____
          [22] Defendants Parrott are successors in interest to Jayme McAllister, who was a Defendant in the
     State Court Proceeding.  *See* Dkt. 67-39.  Defendants Parrott do not dispute that they are in privity with Mr.
     McAllister for the purposes of res judicata and collateral estoppel.

to the railroad right of way adjacent to the defendants' properties is hereby quieted in favor of King County."  Dkt. 66-2 ¶¶ 1, 3, 7, 10, 11, 12.  This resulted in a final decision on the merits. *DeYoung v. Cenex Ltd.*, 100 Wn. App. 885, 892, 1 P.3d 587 (2000) ("A grant of summary judgment is a final judgment on the merits with the same preclusive effect as a full trial.").

Given this, the State Court Proceeding and the current lawsuit involve the same subject matter (the Corridor), causes of action (actions to quiet title), and parties, and the parties are bound by the judgment reached in the State Court Proceeding.  Thus, res judicata applies to preclude Defendants Beres' and Parrotts' counterclaims and defenses challenging Plaintiff's rights in this action.  *See Neighbors v. King Cty.*, 15 Wn. App. 2d 71, 79–80, 479 P.3d 724 (2020).

Collateral estoppel likewise applies.  Again, Plaintiff and Defendants Beres and Parrott were parties, or in privity with parties, to the State Court Proceeding, which ended with a final decision on the merits.  The issue to be decided here—whether, pursuant to the 1875 Act, Plaintiff has title to, and the right to exclusive use and occupancy of, the 200-foot railroad right of way adjacent to Defendants' properties—is identical to the issue decided in the State Court Proceeding.[23]  Finally, application of collateral estoppel would not work an injustice.  This final element "focuses primarily on whether the prior adjudication offered a full and fair hearing on the issue." *Robinson v. Hamed*, 62 Wn. App. 92, 100, 813 P.2d 171 (1991).  The evidence before the Court shows that, in the State Court Proceeding, Plaintiff moved for summary judgment and Defendants were afforded the opportunity to and did respond to Plaintiff's motion,

---

[23] In their submission of the "entire case file containing all substantive issues before the superior court in the prior quiet title action," Dkt. 74 at 33 n.16, Defendants fail to submit Plaintiff's motion for summary judgment in the State Court Proceeding.  However, the court's "Order Granting Summary Judgment and Quieting Title," Dkt. 66-22, adequately apprises this Court of the issues decided in the State Court Proceeding.

1    including by filing an amended response, Dkt. 75-3 at 572–90, and by appealing the court's order

2    quieting title in Plaintiff's favor. *See King Cty. v. Beres*, 2003 WL 21907632, at *1. As such,

3    Defendants were afforded a full and fair opportunity to litigate their claims.[24]

4          Defendants argue the Court should deny Plaintiff's Motion because it is "premature" to

5    prevent enforcement by Defendants Beres and Parrott of this Court's "prospective ruling" and

6    because the State Court Proceeding did not pertain to the Corridor's shorelands, meaning the

7    elements of res judicata and collateral estoppel have not been met. Dkt. 74 at 32. These

8    arguments lack merit. Res judicata and collateral estoppel are intended to "reduce unnecessary

9    litigation and foster reliance on adjudication . . . ." *Allen*, 449 U.S. at 95; *see also Camer v.*

10   *Seattle Sch. Dist. No. 1*, 52 Wn. App. 531, 534, 762 P.2d 356 (1988); *Christensen*, 152 Wn.2d at

11   306. Both doctrines are intended to preclude the relitigation of claims or issues <u>before</u> a second

12   court rules on them, and not only if the second court agrees with the prior court's decision.

13         Further, while Defendants argue neither doctrine applies with respect to the Corridor's

14   shorelands because the prior quiet title action "involved no adjudication whatsoever of the

15   County's rights to the Shorelands," Dkt. 74 at 32, this speaks to the "matter of defenses"—i.e.,

16   that the Equal Footing Doctrine precluded the 1875 Act from granting railroad rights of way over

17   shorelands—"not to the cause of action" or issue decided. *Rains v. State*, 100 Wn.2d 660, 663,

18   674 P.2d 165 (1983). "The defenses asserted by defendants do not change the fact that the

19   subject matter in both actions" is the same—Plaintiff's rights in the Corridor, including its right

20   to exclude Defendants' encroachments therein. *Id.* It is undisputed that the 200-foot Corridor,

21

22         [24] Defendants seemingly contend Plaintiff misled them as to the extent of its claims in the State

23   Court Proceeding, thereby preventing them from raising relevant claims and defenses. Dkt. 74 at 33. But
     Defendants knew Plaintiff sought to quiet title in the entire 200-foot Corridor in the prior action. *See* Dkt.
     75-3 at 16–17. They present no evidence indicating they were misled into believing the 200-foot Corridor
     did not cover the shorelands or that the State Court Proceeding otherwise excluded the shorelands.

extending 100 feet on either side of the "as-built railroad centerline," Dkt. 66-22 ¶ 3, covers the shorelands at issue in this case.  As a result, by quieting title in the entire 200-foot Corridor in Plaintiff's favor, determining Defendants Beres and Parrott have no right to use or occupy the Corridor without Plaintiff's permission, and finding Plaintiff holds an easement entitling it to exclusive use and occupancy of the Corridor, the State Court Proceeding necessarily adjudicated Plaintiff's rights in the Corridor's shorelands.[25]  The Court therefore finds Defendants Beres' and Parrotts' counterclaims and defenses barred by res judicata and collateral estoppel, and Plaintiff entitled to summary judgment.

IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment, Dkt. 40, should be GRANTED IN PART and DENIED IN PART; Defendant Harrell's Motion for Partial Summary Judgment, Dkt. 48, should be GRANTED; and Plaintiff's Cross Motion for Partial Summary Judgment, Dkt. 65, should be GRANTED IN PART and DENIED IN PART.  A proposed order accompanies this Report and Recommendation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[25] And, regardless, the Court finds Plaintiff owns the shorelands in fee simple by operation of Article 17, Section 2.  *See* Section III.C, *supra*.

1

V.    <u>OBJECTIONS</u>

2

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

3

served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

4

Recommendation is signed.  Failure to file objections within the specified time may affect your

5

right to appeal.  Objections should be noted for consideration on the District Judge's motions

6

calendar for the third Friday after they are filed.  Responses to objections may be filed within

7

**fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be

8

ready for consideration by the District Judge on <u>**August 13, 2021**</u>.

9

Dated this 26th day of July, 2021.

10

11

12

S. KATE VAUGHAN
United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23